# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DIANA BRADLEY, et al.,

     Plaintiffs,

    v.

KEVIN MILLER, et al.,

     Defendants.

Case No. 1:10-cv-760

Dlott, J.
Bowman, M.J.

## REPORT AND RECOMMENDATION

### I. Background

The pace of this litigation can be described as halting, as it appears no closer to completion then when initiated two and a half years ago. Currently before the Court is the motion of Defendant James Wilburn Powell to dismiss all claims filed against him. For the reasons explained below, that motion should be granted in part and denied in part. Additionally, and on the Court's own initiative, Plaintiffs' claims against several additional Defendants should be dismissed for failure to prosecute.

On October 29, 2010, three individual Plaintiffs, through counsel, filed suit against three individual and three entity Defendants, seeking monetary damages for various violations of federal laws, including civil RICO, parallel state statutes, and common law, on grounds that Plaintiffs had been victims of a "real estate securities Ponzi scheme." (Doc. 1). Plaintiffs allege that they were victims of the scheme, lured to invest, and ultimately to lose, significant sums of money. The original defendants

included Kevin Miller and James Powell, both incarcerated for federal offenses, and David Colwell (deceased), as well as three corporate defendants identified as Capital Investments, Great Miami Debentures, and Great Miami Real Estate, LLC.

On December 29, 2010, Defendant Kevin Miller filed a *pro se* answer to the complaint, acknowledging that he had pled guilty to conspiracy to commit mail fraud in connection with some of the allegations referenced in the civil complaint, and that he was then serving a 15 month sentence at the Federal Prison Camp in Terre Haute, Indiana.  Defendant Miller was the only Defendant to answer the original complaint.

As previously recounted by this Court, Plaintiffs did very little in the first year of litigation to prosecute their case.  Plaintiffs did not meet and confer with Defendant Miller, filed no Rule 26(f) report, and did not effect service on most of the Defendants.  (*See* Doc. 21, Memorandum Order of 9/28/11).  Plaintiffs ultimately served the three entity Defendants, through service on their incarcerated President, but not within the 120 days allotted by Rule 4(m), Fed. R. Civ. P.  (*Id.*).  While the record does not indicate the status of the latter entities, the allegations of the complaint, and the incarceration of their alleged President, strongly suggest that all three are defunct and without assets.

Based upon the apparent lack of timely prosecution and the federal incarceration of the only two living individual Defendants (both proceeding *pro se* and only one of whom had filed an answer) with the third individual defendant being deceased, in September 2011 the Court directed Plaintiffs to "show cause as to why the corporate Defendants and individual (deceased) Defendant David Colwell should not be dismissed."  (Doc. 21 at 3).  In addition, the Court directed Plaintiffs to state "whether

they intend to continue to prosecute this action." (*Id.*).    Plaintiff thereafter filed a response to the Court's "show cause" order, as well as a motion seeking a retroactive extension of time in which to complete service on the three corporate Defendants. Plaintiffs' response reflected that in late October 2011, after receipt of the Court's "show cause" order, Plaintiffs' counsel issued subpoenas seeking financial records from a number of non-party financial institutions. The Court granted the Plaintiffs' motion to construe service upon the three entity Defendants as if timely made, and directed the corporate Defendants to answer not later than December 12, 2011.  (Doc. 27).

Not surprisingly, no answer or other response has ever been filed by the three entity Defendants.    After reviewing the response to the Court's "show cause" order, in which Plaintiffs expressed their intention to prosecute their case, the undersigned wrote:

> Because this case has now been pending for more than a year without so much as a Rule 26(f) report having been filed, and with formal discovery yet to commence, Plaintiffs' pledge to continue prosecution of their claims, standing alone, is not sufficient. The parties will be expected to very promptly file a Rule 26(f) report. Given the age and status of this litigation, the Court anticipates that the discovery period requested by the parties will not prove lengthy.
> ........
> On or before **December 15, 2011,** Plaintiffs shall fulfill their obligations under Rule 26(f) and file a joint discovery report. To the extent that the parties are unable to file a joint report, they shall file separate reports by the same date, but with an explanation of their prior attempts to meet and confer and agree upon a joint report.

(Doc. 27, Order of 12/2/11 at 3-4).  Because Plaintiffs stated in their response to the Court's show cause order that two Defendants, Midwest Marketing Alliance and (deceased) David Colwell, should be dismissed, the Court dismissed those Defendants on December 22, 2011.  (Docs. 28, 33).  By December 2011, mail sent to Kevin Miller,

the only properly served Defendant who had answered the complaint, was being returned as undeliverable because he was no longer housed at the federal institution at which he previously had been incarcerated. (Docs. 30, 31, 34, 37, 85, 86, 91, 100).

Plaintiffs made a minimal attempt to comply with the Court's order directing them to meet and confer prior to filing a unilateral Rule 26(f) report on December 15, 2011, the date it was due. Plaintiffs' counsel attempted to contact only Mr. Miller, through correspondence dated December 6, 2011 and sent by U.S. Mail to the (undeliverable) FCI Terre Haute address, with a second copy mailed to Mr. Miller in care of a Community Corrections Office. (Doc. 32). Without comment, the Court adopted Plaintiffs' proposed schedule for the scheduling order of this Court, including a deadline of March 15, 2012 for amending the complaint, and a discovery deadline of December 14, 2012. (Doc. 35). On March 14, 2012, Plaintiffs moved to extend the deadline for adding new claims and new parties, alleging that more time was needed, until April 16, 2012, to complete their "investigation" of potentially viable claims/defendants.[1] (Doc. 36). Again, the Court granted Plaintiff's motion without comment.

On April 16, 2012, nearly 18 months after initiating suit, Plaintiffs finally moved to amend. Although the Court granted Plaintiffs' unopposed motion, the Court took care to state that it "was expressing no view as to the propriety of any defenses to the proposed amendment, but will grant Plaintiffs' motion to amend based solely upon the lack of any objection on the present record." After recounting the painstaking pace of this litigation, the Court reiterated its encouragement to Plaintiffs to "use their best efforts to move this

---

[1]Plaintiffs' motion includes a letter to seven persons targeted as "potentially liable" defendants. (Doc. 36-1). Both indicate that February 14, 2012 was the first occasion on which Plaintiffs contacted or

case forward." (Doc. 45 at 3).  The Court again noted that even though four Defendants ostensibly had been served without filing timely answers or responses, Plaintiffs had never sought entry of default against any of those Defendants. (Doc. 45 at 2, n.1).

Plaintiffs' amended pleading on May 17, 2012 expanded the original 78 paragraph, 13 page complaint to 233 paragraphs and 32 pages.  The amended complaint reiterated claims against all original Defendants (except the deceased individual), but also added multiple new claims and defendants, including: James Wilburn Powell (hereinafter "J. Wilburn"), Curtis Powell, Deanna Powell, Hubert Rials, and Chatsworth Jacobs.  (Doc. 46).

In response to the amended complaint, newly identified Defendants J. Wilburn and Curtis Powell filed answers, but Defendant Deanna Powell filed a motion for a more definite statement.  Plaintiffs' response to Ms. Powell's motion rendered moot her motion for a more definite statement, permitting her to answer.  (*See* Docs. 72, 74, 75, 79).  Plaintiffs continued a pattern of *de facto* further amendment by filing "stipulations" that narrowed their claims against Defendants J. Wilburn (Doc. 76), and Curtis Powell. (Doc. 87).

In lieu of filing an answer, Defendant Hubert Rials filed a motion to dismiss all claims against him (Doc. 61). By Report and Recommendation ("R&R") filed on September 25, 2012 and adopted over objection on December 31, 2012 (Docs. 80, 99), the Court granted that motion, dismissing all claims against Mr. Rials, except for Plaintiffs' claim for conspiracy to violate Ohio's civil RICO law.

In an Order filed the same date, the Court was candid in its assessment of

identified any of the prospective defendants.           5

Plaintiffs' amended complaint:

> Plaintiffs' responses to both Rials' motion to dismiss and to Defendant Powell's motion for a more definite statement make clear that the amended complaint is, at least arguably, impermissibly vague. Whether the Report and Recommendation filed this day, dismissing certain claims against Rials, together with the stipulation recently filed by Defendant Powell (Doc. 76), will prove sufficient to cure the defects in the complaint remains to be seen.

Based upon the apparent deficiencies of the amended complaint and "the pace of this litigation," the Court directed the parties to "file joint or separate status reports …indicating whether they anticipate any modification to the scheduling order." (Doc. 79).

On October 9, 2012, Plaintiffs filed a status report with proposed new pretrial deadlines. (Doc. 88). Citing the "consent of all counsel," the Court amended its calendar order to the requested new dates, directing discovery to be completed by June 14, 2013. (Doc. 94).

On October 19, 2012, Defendant J. Wilburn moved to dismiss all claims brought against him. (Doc. 93). On November 12, 2012, Plaintiffs filed a response in opposition, to which Defendant J. Wilburn has filed a reply. (Docs. 97, 98).

On March 12, 2013, Plaintiffs moved to further extend pretrial discovery and dispositive motion deadlines for an additional six months. (Doc. 101). Plaintiffs' memorandum recites that the parties have completed Rule 26(a) initial disclosures, have exchanged "more than 14,000 pages" of documents, and have made "substantial progress" in discovery. Despite this "progress," Plaintiffs sought to extend deadlines for an additional six months solely on the basis of the Defendant J. Wilburn's pending

motion to dismiss, asserting that "the parties would not be certain which Defendants and which counts against those Defendants would be relevant to [continued] discovery, because of the pending motion." (Doc. 101 at 2).

The Court denied the motion, again noting the age of this litigation and the Court's inclination not to further delay.  The Court also pointed out that three months yet remained before the close of discovery.  (Doc. 102).[2]  Given that the instant Report and Recommendation resolves the lone pending motion to dismiss by Defendant J. Wilburn, all parties are again encouraged to proceed expeditiously and without further delay.

## II.  Analysis of Pending Matters

### A.  Claims and Allegations Against Defendant J. Wilburn Powell

Defendant J. Wilburn is the father of Defendant James D. Powell (hereinafter "James").   The younger Powell, an original Defendant and alleged principal of the underlying "Ponzi scheme," was served with both the complaint and amended complaint, but has never filed an answer or other responsive pleading.  James Powell is currently serving out a sentence at the Elkton Federal Correctional Institution in Lisbon, Ohio, on federal charges related to the allegations in this civil lawsuit.

Defendant J. Wilburn was never indicted or charged with any federal offense. Nevertheless, Plaintiffs' amended complaint included twelve separate claims against him and other new defendants, colorfully describing J. Wilburn as the "Financier of Fraud."   After the filing of Plaintiffs' amended complaint, the parties entered into a Stipulation (Doc. 76) whereby Plaintiffs agreed that the only claims that apply to J.

---

[2]Plaintiffs' motion indicated disclosure of one expert; the Court assumes that Plaintiffs have now completed expert disclosures given the expiration of their deadline for doing so.

Wilburn are Counts 6, 7, 11, and 12. J. Wilburn now seeks dismissal of those counts. Defendant argues that he cannot be held liable for his limited parental role, insofar as the extent of his conduct involved occasional loans to his son in tough times.

Before proceeding, it is helpful to review Plaintiffs' specific allegations against J. Wilburn. The amended complaint generally alleges that J. Wilburn

> had a role in the enterprise that was distinct from the pattern of racketeering activity. James Wilburn acted as the Financier of Fraud. In that role he made substantial payments to Capital Investments and Great Miami Debentures to keep the Fraudulent Enterprise afloat. When the enterprise started to fall apart, he arranged to keep portions of the so called portfolio, including Midwest Trailer Park, under the control of the Powell family.

(Doc. 46 at ¶12). Plaintiffs allege two distinct activities by J. Wilburn: (1) the infusion of new capital after withdrawals threatened to end the Ponzi scheme; and (2) participation in fraudulent transfer(s) and/or refinancing of the Midwest Trailer Park.

With respect to the infusion of capital, Plaintiffs allege that the Ponzi scheme began to unravel as a result of investor withdrawals and "numerous foreclosures on the portfolio of properties" (Doc. 46 at ¶134). Plaintiffs allege that J. Wilburn helped to alleviate the financial distress, by giving his son checks in May and August of 2006. (*Id.* at ¶¶133, 138). In September 2006, J. Wilburn allegedly paid $25,000 to Capital Investments, just after his son had to pay the same amount to another alleged principal in the Ponzi scheme, the now-deceased Colwell. (*Id.* at ¶¶144-145). In October 2006, Plaintiffs allege that J. Wilburn made a $95,000 payment to Defendant Capital Enterprises. (*Id.* at ¶150). In November, 2006, J. Wilburn allegedly loaned his son $10,000. In December 2006, Defendant J. Wilburn allegedly paid $31,000 to Defendant

8

Great Miami Debentures.  (*Id.* at ¶154-155).

Plaintiffs allege that one final infusion of capital from J. Wilburn occurred in June 2007, and arose out of a March, 2007 transaction in which J. Wilburn "arranged to receive a mortgage on Eaton Road properties" with payment going to one of his son's companies. (*Id.* at ¶¶157-158).  Because of his mortgage, J. Wilburn was a defendant in a subsequent foreclosure action, referred to by Plaintiffs as the "McFarland litigation." (*Id.* at ¶163).  On the same day that the McFarland litigation was filed, June 1, 2007, J. Wilburn "withdrew $10,000 each from trusts established for two of his grandchildren, Lauren and Evan Powell."  (*Id.* at ¶¶164-165).  Defendant allegedly endorsed those checks over to James, who deposited them into an account for Great American Debentures  (*Id.* at ¶¶166-167).

In addition to these various payments and/or loans, Plaintiffs allege that J. Wilburn participated in his son's corrupt activities through the refinancing and sale of the Midwest Trailer Park, one of the properties in his son's real estate "portfolio."  Plaintiffs allege that despite losing $173,000.00, Defendant J. Wilburn "recouped approximately $700,000" through the Midwest Trailer Park transactions.  (Doc. 46 at ¶31).

In 2003, J. Wilburn sold the Midwest Trailer Park to his son for approximately $600,000, a transaction that Plaintiffs do not appear to challenge. (Doc. 46 at ¶54). James made mortgage payments to his father, until he encountered financial difficulties. Under a heading captioned "Keeping Things in the Family," Plaintiffs allege that James, J. Wilburn and Curtis Powell (described as the "Conduit Cousin"), "executed a complex set of fraudulent transactions related to the Midwest Trailer Park." (*Id.* at ¶169).  First,

James allegedly deeded the property back to J. Wilburn through a quit claim deed for the nominal sum of $1.00.  Plaintiffs complain that at the time, the property "had an appraised value of $1,050,000," with "approximately $580,500 in equity." (*Id.* at ¶¶169-170).  Plaintiffs assert that James and J. Wilburn "made the transfer with actual intent to hinder, delay, or defraud victims of the Fraudulent Enterprise, including Diana and James Bradley, from collecting judgments against James, Great Miami Real Estate, Capital Investments, and Great Miami Debentures." (*Id.* at ¶¶171-173).  Plaintiffs cite the lack of adequate consideration, the fact that J. Wilburn knew that his son's debts and obligations far outweighed his son's ability to pay the investors, and that the transfer occurred when Defendants were facing a wave of foreclosures on their portfolio properties.  Plaintiffs allege that Defendants failed to disclose the transfer to investors, and that the transfer of the Midwest Trailer Park to J. Wilburn left both James and his real estate company insolvent. (*Id.* at ¶¶174-179).

After the transfer back to J. Wilburn, Plaintiffs allege that Defendant "arranged to sell Midwest to Curtis Powell for $700,000." (*Id.* at ¶180).  Plaintiffs allege that J. Wilburn and Curtis Powell "never filed a copy of that contract with the Butler County Recorder." (*Id.* at ¶181).  Instead, son James "assigned his original 2003 land contract" to Curtis Powell.  Based on the amounts already paid by son to father under their original 2003 contract, only $469,500 remained due, an amount significantly less than the sale price to Curtis Powell. (*Id.* at ¶182).

Plaintiffs allege that "Curtis Powell applied to Silver Hill Financial for a mortgage of $682,500" based on the original 2003 land contract, without disclosing the new

10

$700,000 debt to J. Wilburn. After Curtis obtained a $682,500 mortgage from Silver Hill and paid J. Wilburn the remaining $469,500 on the 2003 contract, Plaintiffs allege that J. Wilburn received a new mortgage from Curtis for $215,000, representing "most of the difference between $469,500 and $700,000." (*Id.* at ¶¶191-192). Neither J. Wilburn nor Curtis Powell immediately filed the new mortgage, allegedly waiting until two months after Silver Hill disbursed its mortgage funds. (*Id.* at ¶193).

Having recounted all relevant allegations that pertain to Defendant J. Wilburn, the Court now turns to the specific legal claims against him, which Defendant argues are insufficient to satisfy the pleading standards of Rules 8(a) and 9(b), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2007).

### B. Defendant J. Wilburn's Motion to Dismiss

#### 1. Count Six - Ohio RICO Violation

Counts Six alleges a violation of Ohio's Pattern of Corrupt Activity Act, which is analogous to the federal RICO Act. *See* Ohio Rev. Code §§2923.31, *et seq.* (hereinafter "Ohio RICO"). In order to prevail under O.R.C. §2923.34, a plaintiff must establish: "(1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and (3) that the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise that exists separate and apart from the defendant." *Hall v. CFIC Home Mtg.*, 175 Ohio App.3d 587, 597, 888 N.E.2d 469 (12th Dist. Ct. App. 2008)(citing *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr.*

*Co.*, 94 Ohio App.3d 75, 83, 640 N.E.2d 235 (8th Dist. Ct. App. 1994)).  The failure to plead any of the three essential elements with particularity under Ohio RICO results in a defective complaint that is subject to dismissal.  *Universal Coach v. New York City Transit Authority, Inc.*, 90 Ohio App.3d 284, 291, 629 N.E.2d 28, 32 (8th Dist. Ct. App. 1993)(dismissing Ohio RICO claims for failure to plead elements with specificity).

In his motion to dismiss, Defendant J. Wilburn argues that Plaintiffs have failed to adequately allege either of the first two elements – that J. Wilburn engaged in "two or more" criminal offenses sufficient to constitute "predicate acts," or that he engaged in a "pattern" of corrupt activity sufficient to state a claim under Ohio's RICO law.  Absent either showing, Defendant argues that the Ohio RICO claim must be dismissed.

### a.  Predicate Acts – Fraudulent Transfer, Mail Fraud, and Money Laundering

As stated, Plaintiffs' allegations generally concern two categories: (1) J. Wilburn's donations and/or loans of money to his son or his son's businesses over a thirteen month period between May 2006 and June 2007;[3] and (2) J. Wilburn's actions in the repurchase, refinancing and sale of the Midwest Trailer Park to Curtis Powell.  Defendant argues that neither category is sufficient to establish a single criminal "predicate act," much less "two or more" such acts.  As Defendant is quick to note, Plaintiffs do not allege that they ever met J. Wilburn, or that he was an officer, member, employee, shareholder, or investor in his son's businesses. Plaintiffs do not allege that J. Wilburn himself engaged in direct securities fraud.  Moreover, Plaintiffs withdrew (by Stipulation) the majority of fraud-related claims against J. Wilburn, including Counts Two

---

[3]Defendant specifically denies "many, if not all, of the alleged loans."  However, he concedes that the existence of the loans is more appropriately challenged through a motion for summary judgment after

through Four (federal RICO counts); Count Five (RICO conspiracy); and Counts Eight through Ten (fraud, breach of contract, and negligence under Ohio common law).

Plaintiffs argue that their allegations of mail and wire fraud against all Defendants are sufficient to allege one predicate act by Defendant J. Wilburn.  However, the OCPA requires that any "pattern" of corrupt activity to "include at least one incident" in addition to mail or wire fraud.  O.R.C. §2923.34(B).  Therefore, in order to support a finding of "two or more" predicate acts, as well as to prove a "pattern," Plaintiffs rely upon their allegations regarding the Midwest Trailer Park, and the infusion of new capital by J. Wilburn.

With respect to the Midwest Trailer Park transactions, J. Wilburn argues that fraudulent transfer cannot be considered a predicate act under Ohio law.  See §2923.31(I); *see also Samman v. Nutka*, 2005 WL 2593500 (Ohio Ct. App. 8th Dist. Oct. 13, 2005)(fraudulent transfers do not constitute corrupt activity).  Plaintiffs do not directly respond to this contention, which the undersigned finds to be an accurate representation of Ohio law.

In any event, Plaintiffs chiefly argue that Defendant's multiple transfers of money to his son and/or to his son's companies constituted "money laundering" under Ohio law.  Unlike a fraudulent transfer, the crime of money laundering is listed as a predicate act under O.R.C. §2923.31(I)(2)(a).

In the R&R filed September 25, 2012 (Doc. 80), this Court previously rejected Plaintiffs' argument that Defendant Rials had engaged in money laundering.  In the prior R&R, the Court noted that Plaintiffs' amended complaint itself did not allege that Rials

discovery and not at the pleading stage.          13

had committed "money laundering" or any other predicate act, and partly on that basis, determined the allegations of Plaintiffs' amended complaint were not sufficiently pled to state a claim for a violation of Ohio RICO.   (Doc. 80 at 10).  Plaintiffs' amended complaint similarly fails to allege that Defendant J. Wilburn committed any act of "money laundering." Arguably, given the need to plead a violation of Ohio RICO "with particularity," Plaintiffs' failure to plead specific predicate acts by Defendant J. Wilburn results in a defective complaint that is subject to dismissal, at least as to Count Six. *See Universal Coach v. New York City Transit Authority, Inc.*, 90 Ohio App.3d at 291; *see also State v. Muniz*, 2010 WL 3169268 (8th Dist. Ct. App., Aug. 12, 2010)(the State must set forth the requisite predicate acts in the indictment that it intends on using as the foundation for an Ohio RICO offense); *compare Fremont Reorganizing Corp. v. Duke*, 811 F. Supp.2d 1323, 1338 (E.D. Mich. 2011)(declining to dismiss where "the amended complaint describes in great detail the predicate acts of wire fraud and money laundering that constituted the pattern of illegal activity through which the business of the enterprises was conducted").

Notwithstanding their failure to specify money laundering, Plaintiffs contend that their allegations should be construed as sufficient to allege that predicate act.  In support of that construction, Plaintiffs rely upon *State v. Ross*, 2012 WL 440821 (9th Dist., Ct. App. Feb. 13, 2012), in which the Ohio Court of Appeals affirmed multiple criminal convictions of an attorney who deposited payments from bribes relating to an illegal enterprise into his IOLTA account, including money laundering. However, *Ross* is distinguishable.  In *Ross*, the attorney/County Commissioner was actually involved in

the bribery scheme at issue, and was alleged to have participated in awarding an unlawful public contract in exchange for kick-backs. The defendant argued that the evidence was insufficient to support his conviction for money laundering because he had not done "anything to disguise or misrepresent the source of any funds." The court affirmed in part because the evidence showed that defendant knew the proceeds were obtained by unlawful means, and specifically deposited them into an IOLTA account in order to create the false appearance that the payments were for legal services.

By contrast in this case, Plaintiffs allege only that J. Wilburn provided money on multiple occasions to his son and/or his son's business. J. Wilburn is not alleged to actually have *received* any of his son's ill-gotten gains or participated directly in the securities fraud. Although Plaintiffs partially rely on O.R.C. §1315.55(A)(1) to support their claim of money laundering, that provision requires the person engaging in the "transaction" (here the transfer of funds from father to son) to "[know] that the property involved in the transaction is the proceeds of some form of unlawful activity…." Here, Plaintiffs fail to allege that any of the money that J. Wilburn allegedly provided to his son or his son's businesses was "proceeds of some form of unlawful activity." Instead, Plaintiffs appear to concede that the alleged $173,000.00, that J. Wilburn provided to his son, originated from a legitimate source.

Plaintiffs more heavily rely upon O.R.C. §1315.55(A)(3) to support their claim of money laundering. That section prohibits any person from "conduct[ing] a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity." Plaintiffs allege that J.

15

Wilburn was aware that his son and his son's businesses were in financial straits. Plaintiffs seek to hold J. Wilburn liable based upon the theory that J. Wilburn's payments and/or loans were intended to keep his son and/or the businesses financially afloat, thereby perpetuating the fraud.  Plaintiffs allege that each of approximately twenty payments came on the heels of his son's payment of commissions to Colwell, or repayments to angry investors, or a "wave of foreclosures."  By giving or loaning money to his son and/or infusing his son's businesses with needed capital, Plaintiffs charge that J. Wilburn participated in the enterprise. Plaintiffs argue that each transfer of funds by J. Wilburn constitutes a separate act of money laundering, because the transfers were made to "facilitate" the continuation of his son's ongoing corrupt activities.

The issue presented is whether transfers of cash and/or loans from one individual to another can constitute "money laundering" where (1) the funds that were provided were not proceeds of an illegal enterprise; but (2) the funds allegedly had the effect of facilitating the continuation of an illegal enterprise.  Had a bank provided a business loan to James that he then used to pay rent, and indirectly replace capital he was forced to pay Colwell and/or to investors, could that bank then be held liable? What if the bank was unaware of the effect of its loan?  It is unclear that Ohio legislators intended to make criminally liable for "money laundering" any person who provides money to persons engaged in securities fraud.

Defendant argues that Plaintiffs' interpretation of money laundering "stands the usual relationship on its head."  (Doc. 98 at 6). Rather than "laundering" or "cleansing" illegal proceeds by funneling illegal money through a legitimate business, Plaintiffs seek

16

to hold Defendant liable for giving legitimate funds to his cash-strapped son and an allegedly illegitimate business.

Plaintiffs' construction is unusual, but appears to be within the definition of O.R.C. §1315.55(A)(3).  In light of the liberal standards applicable to a motion to dismiss, and assuming a reviewing court would consider the "predicate offenses" element to be pleaded with sufficient particularity in the absence of Plaintiffs' failure to specify the offense of "money laundering," the undersigned concludes that the amended complaint *might* be construed to allege two or more acts of money laundering.

### b.  Pattern of Corrupt Activity

Pursuant to O.R.C. §2923.31(E), a "'pattern of corrupt activity' requires at least two incidents of corrupt activity that are related to the affairs of the same enterprise, which are not isolated or so closely related to each other and connected in time and place as to constitute a single event." *State v. Hughes*, 1992 WL 52473 * 6 (2d Dist. Ohio Ct. App., March 13, 1992).

Plaintiffs argue that they have sufficiently alleged a "pattern of corrupt activity," through multiple occasions of "money laundering," and that this "pattern" of transfers on twenty different occasions over a thirteen month period, coupled with J. Wilburn's role in the Midwest Trailer Park refinancing, was sufficiently related to the underlying securities fraud perpetuated by Defendant's son.  In support of their claim of civil liability, Plaintiffs cite several Ohio criminal cases.

As with the element of predicate offenses, the issue of whether Plaintiffs have sufficiently alleged a "pattern" of corrupt activity appears to be extremely close.  "The

17

existence of only one scheme to defraud does not automatically preclude the finding of a pattern." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994)(single contractual scheme lasting seventeen months insufficient to show continuity). However, the Sixth Circuit has found the existence of a single scheme to be "significant when combined with other relevant factors in showing a lack of required 'continuity.'" *Id.*, quoting *U.S. Textiles, Inc. v. Anheuser Busch Cos., Inc.*, 911 F.2d 1261, 1269 (7th Cir. 1990).

Again, the Court is guided by its prior analysis of the same issue in the context of Defendant Rials' motion to dismiss. In its prior R&R, this Court also described the "pattern" element as "close given the single scheme [of securities fraud] alleged in this case." However, the Court concluded that "Plaintiffs' allegations that Rials participated in the alleged securities fraud by depositing 20 checks over eighteen months is - barely - sufficient to allege a "pattern" of corrupt activity in this case." (Doc. 80 at 13).[4] For essentially the same reasons, and based upon the additional analysis concerning "money laundering" by J. Wilburn, this Court concludes that Plaintiffs' allegations against Defendant J. Wilburn are sufficient to withstand the pending motion to dismiss. That said, merely calling it the "Powell enterprise" does not mean that Plaintiffs' allegations against every family member with the same surname will prove sufficient to prevail at trial, or even, to overcome a properly supported motion for summary judgment if no genuine issues of material fact exist. But at this stage, the Court's concern is limited to determining whether the allegations are sufficiently pleaded under Rules 8

---

[4]The undersigned recommended dismissal of this claim against Rials for other reasons not applicable here. Therefore, the referenced analysis was in the alternative, to the extent that a reviewing

and 9(b). To that more limited extent and despite the infirmities noted, Count Six survives Defendant's motion to dismiss.

### 2. Count Seven – Conspiracy to Violate Ohio RICO

Whereas Count Six alleges a violation of Ohio's RICO law, Count Seven asserts a claim of conspiracy to violate Ohio's RICO law. *See* O.R.C. §§2923.31(l), 2923.34(A). Because it is broader than the federal RICO statute, Ohio imposes a type of "strict liability" on persons who are guilty of participating in, "directly *or indirectly*," "two or more incidents of corrupt activity...that are related to the affairs of the same enterprise." *State v. Siferd*, 151 Ohio App.3d at 119, 783 N.E.2d 591, 603 (3rd Dist. Ct. App. 2002)(emphasis added). Based upon this concept of "strict liability," Plaintiffs are not required to prove that J. Wilburn himself committed two or more predicate acts in order to prove the conspiracy offense alleged in Count Seven. Instead, Plaintiffs need only show that he cooperated in a "common plan." *See Nat'l Century Financial Enterprises, Inc. v. J.P. Morgan Chase Bank*, 604 F. Supp.2d 1128, 1157 (S.D. Ohio 2009)(holding that liability under Ohio's RICO law may be premised upon a conspiracy theory, in which case "the plaintiff is not required to prove that each defendant committed two or more predicate acts."). However, *Nat'l Century Financial Enterprises* still required proof that the conspiracy was to violate Ohio's RICO law, and to that extent requires proof that the enterprise (even if not each individual Defendant) engaged in two or more predicate acts.

Plaintiffs argue that they have sufficiently alleged their conspiracy count against J. Wilburn, again relying on his alleged actions in "money laundering." Alternatively,

---

court might disagree with the primary stated basis for dismissal.

Plaintiffs seek to hold J. Wilburn liable based upon his "agreement" to a "common plan," referencing the overall Ponzi scheme.

Again, the undersigned is guided by this Court's prior analysis, which rejected Defendant Rials' motion to dismiss Count 7, based in part on its conclusion that Plaintiffs' allegations "sufficiently alleged that some members of the enterprise engaged in the predicate offense of 'Tampering with Records' in violation of Ohio law."  The conspiracy claim against Defendant J. Wilburn appears at least as strong, given the above analysis of money laundering.  Therefore, the undersigned also recommends denial of J. Wilburn's motion to dismiss Count Seven.

### 3.  Counts 11 and 12:  Fraudulent Transfer and Conspiracy

Counts Eleven and Twelve allege that all of the Defendants (collectively) engaged in conduct that amounts to a fraudulent transfer under Ohio's Uniform Fraudulent Transfer Act ("UFTA"), as well as a violation of Ohio's civil conspiracy law concerning that Act.  (Doc. 46, ¶¶231, 233).  Plaintiffs base these Counts upon the transfer of the Midwest Trailer Park property.

"Ohio's Uniform Fraudulent Transfer Act was enacted to create a right of action for a creditor to set aside an allegedly fraudulent transfer of assets."  *Esteco, Inc. v. Kimpel*, 2007 WL 4696855 at *2 (7th Dist., Ohio Ct. App. Dec. 20, 2007).  Defendant argues that Plaintiffs' UFTA claims against him are barred by the applicable four-year statute of limitations.  Defendant points out that the deed that reflects the transfer of the Midwest Trailer Park back to him and/or Curtis Powell was publicly recorded on August 20, 2007, but the amended complaint naming him was not filed until May 17, 2012.

20

Plaintiffs do not dispute the dates of record, but argue that a one-year discovery savings clause should be applied on the facts of this case.  *See* O.R.C, §1336.09(A).  Plaintiffs rely on *United States v. Green*, Case No. 1:00-cv-637 (S.D. Ohio June 15, 2007) for the proposition that the statute runs from one year after a party discovers the "fraudulent nature" of a transfer.  Plaintiffs assert that they did not learn that the Midwest Trailer Park had been transferred to J. Wilburn until "January or February of 2012, when they discovered the transfer on the Butler County Recorder's website."  (Doc. 97 at 16, citing Doc. 46 at ¶176).

However, the issue presented in this case is not when Plaintiffs actually discovered the transfer, but when they could have discovered the transfer through reasonable inquiry.   In the *Green* case, a clear discrepancy existed between the public record of transfer and the discovery of the fraudulent nature of the transfer.  There, the transfer that was recorded materially differed from the true terms of transfer, which were deliberately concealed.  In other words, the loan agreement contradicted the purchase and sale agreement.  *Id.* at 3.  The United States did not discover those contradictions until the government was provided copies of the additional (non-public) documents in connection with an investigation that arose several years later.  For that reason, the Court denied the Defendant's motion for summary judgment.  Nevertheless, the Court held that disputed issues of fact remained concerning whether the United States knew or should have discovered the allegedly fraudulent nature of the transfer on an earlier date.[5]  Here, unlike in *Green*, Plaintiffs allege a recording delay (in 2007) of just two

---

[5]Plaintiffs cite *Green* for the proposition that the "discovery" rule cannot be decided on any dispositive motion, but must instead be submitted to the jury.  However, *Green* stands only for the

21

months, not that there were additional contradictory documents that remained hidden from view for years.

Plaintiff also rely on *Esteco, Inc. v. Kimpel*, 2007 Ohio App. Lexis 6323 (Dec. 20, 2007) to support their position that even when a deed is recorded, a transfer can be "concealed," if "it is not disclosed to the creditor." However, *Esteco* did not involve a statute of limitations, but instead was concerned about the elements of a fraudulent transfer under Ohio's UFTA law. In *dictum*, the Ohio court noted that "[a]lthough some may believe that proving that a deed was recorded proves that the transfer was not fraudulent, it appears that courts have found that a transfer is concealed if it is not disclosed to the creditor." (*Id.* at *6). On the particular facts presented, the court noted that the maker of a loan to a jewelry store would "have no reason to believe that the [disputed] transfer of real estate [to a second company] would be related to its loan" for an unrelated purpose. *Id.* It is unclear whether this *dictum* would have any application to the facts presented here. *See also Eastern Savings Bank v. Bucci*, 2008 WL 5124559 at *10 (7th Dist. Ohio Ct. App., Dec. 4, 2008)(recording deed without notification to creditor did not refute creditor's claim that transfer was "concealed" in violation of UFTA, in light of debtor's misrepresentations).

In short, the cases cited by Plaintiffs are not directly on point with the issue presented, which concerns whether Plaintiffs conducted a "reasonable inquiry" such that they are entitled to claim the benefit of the discovery rule. Defendant argues persuasively that Plaintiffs' 2012 discovery of the 2007 transfer of the Midwest Trailer

---

proposition that disputed issues of fact cannot be resolved on summary judgment, not that all statutes of limitations issues must be submitted to a jury.

Park cannot be viewed as "reasonable."    As this Court previously noted, "very little …

transpired" after Plaintiffs first filed suit in October 2010, with Plaintiffs initially failing to

file so much as a Rule 26(f) report, required to commence discovery.  (Doc. 21).

Plaintiffs did not move to amend their complaint to include J. Wilburn as a Defendant

until April 2012.  The undersigned agrees with Defendant J. Wilburn that "Plaintiffs

should not be permitted to sleep on their rights for some 17 months, then invoke the

discovery rule to saddle defendants with the costs of defending otherwise stale claims."

(Doc. 98 at 9).

Plaintiffs protest that, since filing suit, they served "sixteen subpoenas" and have

received "thousands of financial documents."   However, Plaintiffs did not serve a

subpoena on Silver Hill concerning the Midwest Trailer Park until March of 2012.

Plaintiffs have offered no evidence that they undertook any more timely or reasonable

inquiry concerning the 2007 transfer.  Thus, the Court finds the discovery rule to be

inapplicable to the present case and recommends that J. Wilburn's motion to dismiss

Counts 11 and 12 be granted.

### C. *Sua Sponte* Dismissal of Defendants For Failure to Prosecute

Last, the undersigned takes this opportunity to recommend dismissal of four

Defendants based upon Plaintiffs' apparent failure to prosecute.  Despite this Court

having *repeatedly* noted that Plaintiffs have never moved for entry of default or default

judgment, Plaintiffs have continued to ignore the failure of four of the original

Defendants to answer or otherwise appear. (Doc. 22 at 2; Doc. 45 at 2, n.1; Doc. 79 at

1; Doc. 80 at 2, n.2).   While Plaintiffs are free to sue anyone they wish (including, for

example, the deceased Colwell), dismissal for failure to prosecute is appropriate where Plaintiffs have taken no action in furtherance of their claims over the course of two and a half years.

In addition to the four referenced Defendants, Defendant Chatsworth Jacobs has yet to appear; the record concerning service on him remains unclear.[6]  Regardless of whether Plaintiffs' attempted service should be deemed effective, the record reflects that Plaintiffs have taken no steps toward entry of default judgment against Defendant Jacobs.  Therefore, the undersigned recommends the dismissal of Chatsworth Jacobs, James Powell, Capital Investments, Great Miami Debentures, and Great Miami Real Estate, LLC for failure to prosecute.

### III. Conclusion and Recommendation

For the reasons stated herein, **IT IS RECOMMENDED THAT** Defendant J. Wilburn's motion to dismiss (Doc. 93) be **GRANTED** in part, as to Counts Eleven and Twelve, but **DENIED** as to Counts Six and Seven.  In addition, absent a showing of cause for failing to prosecute claims against the five referenced Defendants, Plaintiffs' claims against Defendants Chatsworth Jacobs, James Powell, Capital Investments, Great Miami Debentures, and Great Miami Real Estate, LLC should be dismissed for failure to prosecute.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

---

[6]A summons was returned unexecuted as to Defendant Jacobs.  (Doc. 62).  The record reflects service via ordinary mail by the Clerk of Court, (Doc. 59), as well as a "Notice for Order for Service by Publication." (Doc. 70).  All documents reflect the address provided for Mr. Jacobs by Plaintiffs.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DIANA BRADLEY, et al.,                                         Case No. 1:10-cv-760

       Plaintiffs,

                                                    Dlott, J.
     v.                                                                   Bowman, M.J.

KEVIN MILLER, et al.,

       Defendants.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).