UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DIANA BRADLEY, *et. al*, | : | Case No. 1:10-cv-760 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| KEVIN MILLER, *et. al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR SANCTIONS AGAINST JAMES D. POWELL (Doc. 187) AND GRANTING PLAINTIFFS' MOTION FOR SANCTIONS AGAINST KEVIN MILLER (Doc. 192)

This civil action is before the Court on Plaintiffs' Motion for Sanctions Against James D. Powell (Doc. 187) and Motion for Sanctions Against Kevin Miller (Doc. 192). No responsive memoranda have been filed.

## I. BACKGROUND

Plaintiffs took the depositions of James D. Powell on May 28, 2013 and Kevin Miller on July 25, 2013. (Docs. 163, 191). At the depositions, both Defendants refused to answer questions based on their Fifth Amendment rights against self-incrimination. (*Id)*. Plaintiffs now move the Court to draw negative inferences from Defendants' refusal to answer.

## II. STANDARD OF REVIEW

In civil litigation, a defendant may be confronted with issues related to his or her potential criminal conduct. *See e.g., SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

In that circumstance, the defendant may invoke the Fifth Amendment privilege against self-incrimination.  *Id*.  When a defendant does so, the court is "free to draw adverse inferences from [the defendant's] failure of proof.  *Id*.  When a court draws such an adverse inference, the inference must be "given no more evidentiary value that was warranted by the facts."  *Id*. at 678 (internal citation omitted).  This means that "such an adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer."  *Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).

### III.     ANALYSIS

**A.     Inferences Against James D. Powell**

**1.     Ponzi Scheme Issues**

In his deposition, James D. Powell took the Fifth Amendment on several issues related to the alleged Ponzi scheme.  Question 1 asked whether Powell's business "turned into a Ponzi scheme." (Doc. 163 at 24, 25).  Question 2 asked whether the "business became a Ponzi scheme due to Mr. Powell's desperation to pay investors."  (*Id.* at 30).

There is independent evidence that these statements are true, because Defendant Powell's attorney attested to these facts in his sentencing memorandum in the criminal case.  (Doc. 187-2 at 4-5).

The negative inference drawn from Questions 1 and 2 is that Defendant Powell would have answered "Yes" if he had not taken the Fifth Amendment.

### 2.   David Colwell

Defendant Powell also took the Fifth Amendment on questions related David Colwell.  For Question 3, Defendant Powell refused to answer whether he got together with Colwell for lunch one day.  (Doc. 163 at 25-26).  For Question 4, Defendant Powell refused to answer whether he "trusted Mr. Colwell to recruit and communicate with investors."  (*Id.* at 28).  Question 5 asked whether investors continued to be recruited by Colwell" after the foreclosures began on the Great Miami Real Estate ("GMRE") properties.  (*Id.* at 30).  Question 6 asked whether Colwell was the president of Midwest Marketing Alliance ("MMA").  (*Id.* at 34-35).  Question 7 asked whether Colwell was running the business of Capital Investments ("CI") when he was making out checks to investors.  (*Id.* at 64-65).  Question 8 asked whether Colwell made loans to GMRE.  (*Id.* at 119).

There is independent evidence for Questions 3, 4, 5, and 6, because those statements are drawn directly from Defendant Powell's sentencing memorandum.  (Doc. 187-2 at 4-6).  For Question 7, there is independent evidence in the record because in Defendant Powell's sentencing memorandum, his attorney stated that "Colwell actually had a lot of control over this business endeavor," Defendant Powell said that he gave Colwell his signature stamp to write checks, and the checks have Defendant Powell's signature with the payor as CI and the payee an investor.  (Doc. 163 at 64-65; Doc. 187-5 at 7).  There is independent evidence for Question 8, because the April 6, 2006 check is made out to Colwell and is marked "Loan repayment."  (Doc. 187-5 at 2).

The negative inference drawn from Questions 3, 4, 5, 6, 7, and 8 is that all those questions would have been answered "Yes."

**3.      Capital Investments, Great Miami Debentures, Great Miami Real Estate**

In his deposition, Defendant Powell took the Fifth on questions related to CI, Great Miami Debentures ("GMD"), and GMRE.  (Doc. 163 at 32-33, 45, 46, 51, 55, 68, 71, 73, 83).

Question 9 asked whether, during the time that he was associated with Colwell, he presented himself as president of CI, GMD, and GMRE.  (*Id*. at 32-33).  There is independent evidence that he did so in his Statement of Facts, where Defendant Powell admitted that he was "president of CI, GMD, and GMRE."  (Doc. 187-1 at 2).

Question 10 asked whether the check for $2,500 to First Financial and the check for $1,000 to Deanna Powell were for running GMD.  (Doc. 163 at 45-46).  There is independent evidence for these propositions because GMD was the payor on the checks.  (Doc. 187-5 at 2).

Questions 11, 12, and 13 asked, respectively, whether the $920 check to H&S Realty, the $2554.20 check to First Financial, and the $1373.48 check to Option One Mortgage were for running GMRE.  (Doc. 163 at 51-52).  There is independence evidence that the checks were to run GMRE because GMRE was the payor.  (Doc. 187-5 at 3).

Questions 14, 15, 16, and 17 asked whether the checks to Hermann Plumbing, Ray Jacobs Plumbing, and Wallace Stanfill were to run GMD.  (Doc. 163 at 54-55).  There is

independent evidence that the checks were to run GMD because GMD was the payor. (Doc. 187-5 at 4-5).

Question 18 asked whether the $4,964 check to Duke Energy was to pay utility bills on Defendant Powell's properties. (Doc. 163 at 68). There is independent evidence that the check was for GMRE properties because GMRE is the payor and GMRE was the company that supposedly owned the portfolio properties. (Doc. 187-5 at 8).

Question 19 asked whether the checks on Doc. 187-5 at 9 were for running GMD. (Doc. 163 at 70-71). There is independent evidence that the checks were for running GMD because GMD was the payor. (Doc. 187-5 at 9).

Question 20 and 21 asked whether the $23,000 check to Deanna Powell and the checks on Doc. 187-5 at 11 were for running GMD. (Doc. 163 at 73, 83). There is independent evidence that the checks were for running GMD, because GMD was the payor. (Doc. 187-5 at 10-11).

The negative inference drawn from Questions 8 to 21 is that Defendant Powell would have answered "Yes" had he not taken the Fifth.

### 4. Fiserv

Defendant Powell also took the Fifth on questions related to Fiserv. (Doc. 163 at 33- 34, 57, 159, 160).

Question 22 asked whether a $55 check to Fiserv was for Defendant Powell's payments to Fiserv. (*Id.* at 57). There is independent evidence that the check was for his payments to Fiserv, because the memo read "Fees for Savannah Morgan." (Doc. 187-5 at 6).

5

Question 23 asked whether Defendant Powell arranged for Colwell to be the disinterested third party with Fiserv.  (Doc. 163 at 159).  There is independent evidence that Defendant Powell made these arrangements because in his Statement of Facts he stated that he "executed the Declaration of Feasibility" regarding Colwell and that Colwell held himself out as the "disinterested independent third party."  (Doc. 187-1 at 4).

The negative inference drawn from Question 22 and 23 is that Defendant Powell would have answered "Yes" if he had not taken the Fifth.

### 5.    Advances/Loans from James Wilburn and Betty Powell

Defendant Powell also refused to answer questions related to advances or loans from his parents, James Wilburn Powell and Betty Powell.  (Doc. 163 at 43, 48-49, 56, 69-70, 74, 76-77, 84, 85, 127-28, 136-37).

Question 24 asked whether Defendant Powell explained to Wilburn Powell that the $120,000 advances that Wilburn Powell set off on the Midwest deal were for GMRE.  (Doc. 163 at 43).  There is independent evidence that Defendant Powell explained that the $120,000 in advances were for GMRE, because he testified that he asked Wilburn for money for his "business" and his business was "running Great Miami Real Estate."  (*Id.* at 42).

The negative inference drawn from Question 24 is that Defendant Powell would have answered "Yes" if he had not taken the Fifth.

Question 25 asked whether Wilburn Powell put any restrictions on the $5,000 check from August 28, 2006.  (*Id.* at 48).  There is independent evidence that Wilburn

6

Powell did not put restrictions on the check because Defendant Powell testified that there were no restrictions on other checks that Defendant Powell received from his parents. (*Id.* at 72, 78, 81, 82).

The negative inference drawn from Question 25 is that Defendant Powell would have answered "No" if he had not taken the Fifth.

### 6.    Investors

Defendant Powell also took the Fifth Amendment on questions related to investors in his companies, CI, GMD, and GMRE.  (*Id.* at 57, 64, 116-17, 134-36, 157).

Question 26 asked whether a check for $600 to Wanda Tomlinson was a check to one of Defendant Powell's investors.  (*Id.* at 57).  There is independent evidence that Tomlinson was one of the investors with Defendant Powell, because she was one of the investor/victims and there is a check from CI with a memo reading "Wanda Tomlinson." (Doc. 187-12 at 12; Doc. 187-5 at 6).

Question 27 asked whether a $1,287 check was to Betty Sickels, one of Defendant Powell's investors.  (Doc. 163 at 57).  There is independent evidence that the check was to Sickels, because she was one of Defendant Powell's investors and she is the payor on the check.  (Doc. 187-12 at 11; Doc. 187-5 at 6).

Question 28 asked whether Florence Downs was an investor and whether the check for $54,030 was a payoff to her.  (Doc. 163 at 116).  There is independent evidence that the check was to investor Florence Downs because CI is the payor, Florence Ann Downs is the payee, the memo says "Close #30750/70," and the signature was the stamp

that Defendant Powell gave Colwell permission to use. (Doc. 187-3 at 2; Doc. 163 at 59, 64, 118).

Question 29 asked whether a $5,549 check to Bert Craft was a payoff to an investor in CI. (Doc. 163 at 116-17). There is independent evidence that the check was a payoff to an investor because the payor is CI, the payee was Bert Craft of Fifth Third Bank, the memo says "Pay-out #081150/11," and the signature was the stamp that Defendant Powell gave Colwell permission to use. (Doc. 187-3 at 3; Doc. 163 at 59, 64, 118).

Question 30 asked whether a $5,219.62 check was a pay-out to investor Susan Wolf. (Doc. 163 at 117-18). There is independent evidence that the check was to investor Susan Wolf because the payor is CI, the payee was "Fiserv: FBO Susan Wolf," the memo says "Full pay-out of #06000070939," and the signature was the stamp that Defendant Powell gave Colwell permission to use. (Doc. 187-3 at 4; Doc. 163 at 59, 64).

Question 31 asked whether James Wolf was one of Defendant Powell's investors and the $11,136.97 check was a pay-out to him. (Doc. 163 at 118). There is independent evidence that the check was a payout to James Wolf because CI was the payor, the payee was "Fiserv: FBO James D. Wolf," the memo read: "Full pay-out of #06000074679," and the signature was the stamp that Defendant Powell gave Colwell permission to use. (Doc. 187-3 at 4; Doc. 163 at 118).

The negative inferences drawn from Questions 26-31 are that Defendant Powell would have answered "Yes" if he had not taken the Fifth.

8

### 7.    Guaranteed Interest

Question 32 asked whether the 6.5% guaranteed interest that CI promised was based on the profits that Defendant Powell anticipated making with GMRE.  (Doc. 163 at 161).  There is independent evidence that this was true because Defendant Powell testified that until January 2008, he sent a letter to investors saying that "CI was a success and continued to be an active player in the investment industry providing yields that are higher than those found elsewhere in the marketplace."  (Doc. 163 at 16-17).  At that time, he was paying the rate of interest and he thought he could hold the business together.  (*Id.* at 17).

The negative inference drawn from Question 32 is that Defendant Powell would have answered "Yes."

### 8.    Midwest Trailer Park

Based on his Fifth Amendment right, James D. Powell also refused to answer questions about Midwest Trailer Park.  (Doc. 163 at 125, 129-30, 131, 132, 151, 158).

Question 33 asked whether the $50,000 check from Curtis Powell was part of the Midwest deal.  (*Id.* at 125).  There is independent evidence that the check was part of Midwest deal because Curtis Powell testified that "the $50,000 that I gave to Jamie was to be my buy-in to Midwest and was to be used to purchase other property."  (Doc. 187-13 at 19).

Question 34 asked whether the $12,000 check from Curtis Powell was related to the Midwest Trailer Park deal.  (Doc. 163 at 132-33).  There is independent evidence that the $12,000 was related to Midwest because Curtis Powell testified that Defendant

Powell asked him for the money, saying, "You know that I had equity in Midwest and now I don't have anything and I don't know what I'm going to do." (Doc. 187-13 at 69-70).

Question 35 asked whether a $10,000 check from Curtis Powell was related to the Midwest deal. (Doc. 163 at 151). There is independent evidence that the $10,000 check was related to Midwest, because Curtis Powell testified that before the Midwest deal closed, Defendant Powell called him, saying, "I'm going to go ahead – can I get my commission before you close?" (Doc. 187-13 at 66). Curtis Powell asked: "Well, how much is the commission?" (*Id*). Defendant Powell answered, "It will be around $10,000." (*Id*).

The negative inference drawn from Questions 33-35 is that Defendant Powell would have answered "Yes."

### 9.    Foreclosures

Defendant Powell also refused to testify about foreclosures on his properties. (Doc. 163 at 143-45, 157).

Question 36 asked whether the foreclosure on 13623 was a property owned by GRME. (*Id*. at 143). That property was at 2075 Chapman Road. (Doc. 187-9). Question 37 asked whether the foreclosure on 13688 was against a GMRE property. (Doc. 163 at 144). That property was 2059-61 Chapman Road. (Doc. 187-10 at 9-13). Question 38 asked whether the property on 13732 was a GMRE property. (Doc. 163 at 144). That was the property at 41, 45 and 59 North Brookwood. (Doc. 187-8 at 5).

10

There is independent evidence that these were all portfolio properties because all three are listed as portfolio properties and all three are subjects of foreclosure complaints. (Doc. 187-8, 187-9, 187-10; Doc. 187-7 at 3-5).

The negative inference drawn from Questions 37-38 is that Defendant Powell would have answered "Yes."

### 10.    Florida Investments

Defendant Powell also refused to testify about his investments in Florida.  (Doc. 163 at 148-50).

Question 39 asked whether Edward Byington was one of the investors in Defendant Powell's Florida properties.  (*Id.* at 149).  There is independent evidence that Byington was an investor in the Florida properties because Defendant Powell listed Arbors of Lake Harris as one of his portfolio properties and on February 13, 2008 Colwell purported to sign over the Lake Harris property to Byington.  (Doc. 187-6; Doc. 187-7 at 6).

The negative inference drawn from Question 39 is that Defendant Powell would have answered "Yes."

### 11.    Financial Condition at the Time of the Midwest Trailer Park Transfer

During his deposition, Defendant Powell also refused to answer questions on his financial condition at the time he transferred the Midwest Trailer Park to Wilburn Powell. (Doc. 163 at 156-59).

Question 40 asked whether, after Defendant Powell transferred Midwest to Wilburn Powell, he did not have sufficient assets to pay off his outstanding debts.  (*Id.* at

156-57). Question 41 asked whether he had other foreclosures pending when he transferred Midwest. (*Id.* at 157-58). Question 42 asked whether he had he had other substantial assets at the time of the Midwest transfer. (*Id*). Question 43 asked whether he was broke after he transferred Midwest. (*Id.* at 158).

There is independent evidence that Defendant Powell did not have sufficient assets to pay off his debts, that he had other foreclosures pending, that he did not have substantial assets, and that he was broke after he transferred Midwest because he testified as follows: "I signed over the interest in Midwest Mobile Home Park back to James W. Powell in lieu of foreclosure. I had already had foreclosures on all the other properties, and I didn't need to go defend another foreclosure when it's clearly evident that I had defaulted for over a year on the property." (*Id.* at 124). Furthermore, Curtis Powell testified that around Labor Day of 2007, Defendant Powell called and told him: "I've lost everything, I don't have any of my properties. I don't even have enough money to even make my mortgage on my house." (Doc. 195 at 69-70).

The negative inference drawn from Questions 41-43 is that Defendant Powell would have answered "Yes."

Question 44 asked whether Defendant Powell disclosed the Midwest transfer to GMRE and CI investors. (Doc. 163 at 157). There is independent evidence that he did not disclose, because he testified that in January and February 2008, shortly after the Midwest transfer, he sent mailings out to the investors. (Doc. 187-11). Those mailings did not say anything about transferring Midwest. (*Id*).

The negative inference drawn from Question 44 is that Defendant Powell would have answered "No."

### 12. Wayne Robinson/Marlou Court

Defendant Powell also refused to answer questions regarding a property on Marlou Court. (Doc. 163 at 139, 146).

Question 45 asked whether Defendant Powell knew Wayne Robinson. (*Id.* at 146). There is independent evidence that Defendant Powell knew Robinson because Curtis Powell testified that Defendant Powell was involved with Robinson and the Marlou deal. (Doc. 187-13 at 20).

Question 46 asked whether he had $30,000 from Howard Wayne Robinson. (Doc. 163 at 139). There is independent evidence that Defendant Powell had $30,000 from Robinson because Curtis Powell testified that Robinson told him that Defendant Powell had borrowed $30,000. (Doc. 187-13 at 20).

Question 47 asked whether $1,500 for the Marlou deal came from his personal account. (Doc. 163 at 139). There is independent evidence that $1,500 came from Defendant Powell because Curtis Powell testified that "Jamie had $1,500 that came out of his wife's account." (Doc. 187-13 at 23).

Question 48 asked whether Wilburn Powell paid Robinson $20,000 on the Marlou deal. (Doc. 163 at 148). There is independent evidence that Wilburn Powell paid Robinson $20,000 on the Marlou deal because Wilburn Powell arranged to provide a bank check to Robinson for $20,000, and Wilburn Powell's own checking account shows: "for Bank ok – payable to Wayne Robinson." (Doc. 183-5 at 2). In Wilburn

Powell's check register, he put the entry: "6/13/07 WAYNE ROBINSON (BANK

CHECK) LOAN TO JAMIE" $20,000.  (Doc. 183-3 at 1).

The negative inference drawn from Questions 46-48 is that Defendant Powell

would have answered "Yes."

**B.      Inferences Against Kevin Miller**

Question 1: "The statements in the attached Statement of Facts are true aren't

they?" (Doc. 191 at 14).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at

1-8).

Question 2: "Isn't it true that, from at least May 2005 and continuing up to at least

July 1, 2008, Kevin Miller, James D. Powell, and David Colwell, among others

(conspirators), participated in a mail fraud, real estate, securities conspiracy?" (Doc. 191

at 14).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 1).

Question 3: "Isn't it true that Kevin Miller committed acts of obstruction in

contemplation of or relating to the federal investigation into the mail fraud conspiracy?"

(Doc. 191 at 14-15).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 1).

Question 4: "Isn't it true that the conspirators devised a scheme to obtain money

and property from numerous victims under the guise of a purported investment in Capital

Investments, Great Miami Debentures, or Great Miami Real Estate by means of false and

fraudulent pretenses, representations, and promises?" (Doc. 191 at 15).  Inference: Yes.

Independent evidence citation: (Doc. 192-1 at 1).

Question 5: "Isn't it true that Kevin Miller, along with other conspirators, was a salesperson for CI?" (Doc. 191 at 15-16). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 6: "Isn't it true that in November 1999, Kevin Miller was ordered by the Ohio Division of Securities to cease and desist in the fraudulent sale of unregistered securities, in November 1999 (relating to FLIC)?" (Doc. 191 at 16). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 7: "Isn't it true that again in February 2001, the ODS ordered Miller to cease and desist selling securities relating to the sale of unregistered securities known as Tee to Green?" (Doc. 191 at 16). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 8: "Isn't it true that Kevin Miller was not licensed by the Ohio Division of Securities to sell securities after November 1999?" (Doc. 191 at 16). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 9: "Isn't it true that Fiserv was an entity serving as an Individual Retirement Account ('IRA') trustee/custodian for self-directed IRA accounts?" (Doc. 191 at 17). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 10: "Isn't it true that the conspirators would offer investments to numerous victims, many of whom were elderly, unsophisticated, or inexperienced investors?" (Doc. 191 at 17). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 1).

15

Question 11: "Isn't it true that, in addition, many of the victims attended the Princeton Pike Church of God in Fairfield, Ohio with two of the conspirators?" (Doc. 191 at 17). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 1).

Question 12: "Isn't it true that some of the investors were also insurance clients of the conspirators?" (Doc. 191 at 17). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 1).

Question 13: "Isn't it true that the conspirators took advantage of the trust developed through this common church affiliation and prior insurance agency relationship, as well as the advanced age and lack of financial sophistication of many of the investors?" (Doc. 191 at 17-18). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 1).

Question 14: "Isn't it true that consistent with a classic Ponzi-type scheme, the conspirators fraudulently obtained, and then convened to their own use, investor monies under the guise of a legitimate investment?" (Doc. 191 at 18). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 15: "Isn't it true that as part of the conspiracy, interest payments were made to some earlier investors with money obtained from later investors to create the appearance of a profitable investment and to lull the victims into a false sense of security, until the money was gone and the entire investment scheme collapsed?" (Doc. 191 at 18). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 16: "Isn't it true that the conspirators would induce victims to roll over their pre-existing IRA's into investments in promissory notes or debt investments with CI

16

or GMD, using Fiserv as an IRA Trustee/Custodian?"  (Doc. 191 at 18).  Inference: Yes.
Independent evidence citation: (Doc. 192-1 at 2).

Question 17: "Isn't it true that these promissory notes and mortgage security notes
evidencing an investment backed by a debt instrument constituted 'securities' within the
meaning of federal and state securities laws?"  (Doc. 191 at 18-19).  Inference: Yes.
Independent evidence citation: (Doc. 192-1 at 4).

Question 18: "Isn't it true that through Fiserv, James D. Powell executed a
Declaration of Feasibility dated November 3, 2004 to establish a retirement plan with
Fiserv for investments into CI and/or GMD?"  (Doc. 191 at 19).  Inference: Yes.
Independent evidence citation: (Doc. 192-1 at 2).

Question 19: "Isn't it true that in a Declaration of Administrative Feasibility
submitted to Fiserv to open retirement plan accounts for investors, a co-conspirator
falsely agreed on behalf of CI or GMD to provide investors 'with all information and
documentation regarding their investment,' and further agreed to appoint a 'disinterested
third party entity' as Servicing Agent/Entity to carry out certain responsibilities on behalf
of the note holders (investors)?"  (Doc. 191 at 20).  Inference: Yes.  Independent
evidence citation: (Doc. 192-1 at 2).

Question 20: "Isn't it true that the conspirators did not provide the investors with
all information about, among other things, the Real Estate Portfolio purportedly backing
their investments?  In addition, the Servicing Agent/Entity was not a disinterested third
party but rather, was a co-conspirator who operated MMA and who personally

fraudulently obtained victims' investments pursuant to the conspiracy?" (Doc. 191 at 20). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 21: "Isn't it true that in furtherance of the conspiracy, Kevin Miller, James D. Powell, David Colwell, and others made false and fraudulent representations and promises, and failed to disclose known material information, to the victim investors in order to induce them to invest money in CI or GMD?" (Doc. 191 at 20-21). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 22: "Isn't it true that the false statements included falsely promising guaranteed rates of return on their investments exceeding their current investment rates?" (Doc. 191 at 21). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 23: "Isn't it true that the false statements included falsely representing to the victims that their investments were safe and sound, that the principal amount was without risk or 100% guaranteed, and that their investments were FDIC-insured?" (Doc. 191 at 21). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 2).

Question 24: "Isn't it true that the false statements included falsely representing that the victims' investments were backed by equity in real estate properties purchased or developed with investor monies, owned by GMRE and located in the Hamilton/Middletown/Fairfield, Ohio area, and in Florida?" (Doc. 191 at 22). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 25: "Isn't it true that many of such properties were not purchased or developed with investor monies and were not owned by GMRE but rather, were owned

18

by one of the conspirators, or the spouse or parent of a conspirator?" (Doc. 191 at 23).

Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 26: "Isn't it true that by November 2007 many of the properties lacked substantial equity, were in a state of disrepair, were in default, or were in some stage of foreclosure?" (Doc. 191 at 22). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 27: "Isn't it true that the false statements also included presenting to victims one of several versions of a document titled 'Real Estate Portfolio' which purported to list the properties backing the victims' investments in CI by address, with the value, debt, income, and payment for each property?" (Doc. 191 at 22-23). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 28: "Isn't it true that the Real Estate Portfolio falsely represented that the number of CI properties increased from 13 properties to 40 properties and the value of the properties increased from $4 million to over $14 million with an overall property equity of about $10.5 million?" (Doc. 191 at 22-23). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 29: "Isn't it true that in fact, many of the properties listed on the portfolios were not purchased with investor monies, were owned by others or had no record of existence at all?" (Doc. 191 at 23). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 3).

Question 30: "Isn't it true that the false statements included falsely confirming in monthly statements to victims the principal amount of their initial investment plus

interest earned, when, in fact, by or before November 2007, the investors' money was gone and the conspirators were scrambling each month to come up with the monthly interest payments being made to certain of the investors?" (Doc. 191 at 23-24). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 31: "Isn't it true that the false statements included falsely representing in periodic lulling letters to victims from the president of CI, a co-conspirator herein, that the victims' investments were sound and doing well, including falsely representing in a January 8, 2008 letter that CI was a 'success' and continued to be 'an active player in the investment industry' providing 'yields that are higher than those found elsewhere in the marketplace?'" (Doc. 191 at 24). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 32: "Isn't it true that in fact, by or before November 2007 the investors' money was gone, with many of the properties which purported to back the victims' investments in or approaching foreclosure?" (Doc. 191 at 24). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 33: "Isn't it true that the failure to disclose by Kevin Miller, David Colwell, James D. Powell, and others included failing to disclose to investors that the promissory notes/securities being sold by CI, GMRE, or GMD, or all of them, or any other entity known or unknown, were unregistered?" (Doc. 191 at 25). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 34: "Isn't it true that the failure to disclose by Kevin Miller, David Colwell, James D. Powell, and others included failing to disclose that the conspirators

were not licensed to sell securities?" (Doc. 191 at 25). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 35: "Isn't it true that the failure to disclose by Kevin Miller, David Colwell, James D. Powell, and others included failing to disclose that David Colwell had surrendered his securities sales license after he was ordered to cease and desist in the prior fraudulent sale of unregistered securities?" (Doc. 191 at 25). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 36: "Isn't it true that the failure to disclose by Kevin Miller, David Colwell, James D. Powell, and others included failing to disclose that defendant Kevin Miller also had surrendered his securities sales license after he was twice ordered to cease and desist in the prior fraudulent sale of unregistered securities?" (Doc. 191 at 25). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 37: "Isn't it true that more than 80 victims lost all their investments, valued in excess of $7 million, with many victims losing their life savings?" (Doc. 191 at 26). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 4).

Question 38: "Isn't it true that Kevin Miller performed a variety of acts in order to further the scheme to defraud?" (Doc. 191 at 26). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 1, 4).

Question 39: "Isn't it true that Kevin Miller first became involved with Cora May Pyles in December 1999?" (Doc. 191 at 26). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 8).

Question 40: "Isn't it true that on December 1, 1999, acting as an Illegal Salesman, Miller persuaded Mrs. Pyles to invest $50,000 with a 'Financial Corporation'?" (Doc. 191 at 26). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 75).

Question 41: "Isn't it true that Miller provided Pyles with an official-looking securities certificate, in which the Financial Corporation promised to pay Pyles six percent interest or $250 per month for ten years?" (Doc. 191 at 27). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 75).

Question 42: "Isn't it true that in January 2010, after ten years of payments, the Bogus Shell was to pay Pyles the entire $50,000 in a lump sum?" (Doc. 191 at 27). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 75).

Question 43: "Isn't it true that for almost the entire ten years, Miller actually did provide Pyles with the monthly payments of $250? In November 2009, however, Miller stopped making the monthly payments?" (Doc. 191 at 27). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 79).

Question 44: "Isn't it true that Miller did not inform Mrs. Pyles that he was not licensed to sell securities?" (Doc. 191 at 28). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶ 15).

Question 45: "Isn't it true that in January 2010, he failed to pay the $50,000? As it turned out, by January 2010, the $50,000 Mrs. Pyles had trusted with Miller was gone?" (Doc. 191 at 28). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶¶ 79-84).

22

Question 46: "Isn't it true that as a result, Mrs. Pyles lost the entire $50,000 and approximately two months of interest payments?" (Doc. 191 at 28). Inference: Yes. Independent evidence citation: (Doc. 173-1 at ¶¶ 79-84).

Question 47: "Isn't it true that beginning sometime prior to 2002, defendant Kevin Miller was engaged in the business of selling insurance?" (Doc. 191 at 28-29). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 48: "Isn't it true that Kevin Miller sold various insurance products to clients, including to Diana Bradley and James Bradley?" (Doc. 191 at 28-29). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 49: "Isn't it true that Diana Bradley and James Bradley later invested money in CI based upon false and fraudulent representations by defendant Kevin Miller pursuant to the conspiracy described herein?" (Doc. 191 at 29). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 50: "Isn't it true that sometime in 2004 or 2005, the defendant Kevin Miller met with a co-conspirator, David Colwell, who was operator of Midwest Marketing Alliance (MMA) and agreed to seek out investors to invest money into CI or GMD?" (Doc. 191 at 14). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 51: "Isn't it true that MMA was an unincorporated entity operated by another co-conspirator, David Colwell?" (Doc. 191 at 29). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 52: "Isn't it true that Kevin Miller and David Colwell agreed to falsely represent to investors that their investments would be safe and would be backed by income-producing commercial and industrial properties owned by a local real estate development firm, in exchange for a sales commission to be paid to defendant?"  (Doc. 191 at 30).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 5).

Question 53: "Isn't it true that sometime in or after June 2005, the defendant Kevin Miller persuaded Diana Bradley and James Bradley to invest approximately $134,353 CI and GMD?"  (Doc. 191 at 30).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 5).

Question 54: "Isn't it true that James and Diana Bradley were insurance clients of Mr. Miller?"  (Doc. 191 at 30).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 5).

Question 55: "Isn't it true that based on defendant's false and fraudulent representations that the investment was safe and backed by a locally-owned real estate firm with income-producing properties, with a guaranteed rate of return on the investment of 6.65%?"  (Doc. 191 at 30-31).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 5).

Question 56: "Isn't it true that as to the investment of Diana Bradley, the defendant Kevin Miller induced Diana Bradley to roll over the funds in her existing IRA, in the amount of $45,990.77, into an investment with CI/GMD, and thereafter used and caused the use of the U.S. Mails?"  (Doc. 191 at 31).  Inference: Yes.  Independent evidence citation: (Doc. 192-1 at 5).

24

Question 57: "Isn't it true that Kevin Miller caused Diana Bradley to fill out and have placed in the U.S. Mails various documents to authorize the transfer of her IRA account into a promissory note investment with CI/GMD, through a Fiserv retirement plan account with Fiserv as the Trustee/Custodian of the IRA account, and with the co-conspirator who operated MMA named as the 'disinterested third party account representative'?" (Doc. 191 at 31). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 58: "Isn't it true that Kevin Miller thereafter caused James D. Powell, a co-conspirator who was the president of CI, GMD, and GMRE, to send through the U.S. Mail to Diana Bradley a document reflecting the transfer of the funds in Diana Bradley's IRA account into CI/GMD?" (Doc. 191 at 31-32). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 59: "Isn't it true that Kevin Miller or his co-conspirators caused a letter dated January 8, 2008 to be sent to Diana Bradley and James Bradley through the U.S. Mail, representing that CI was a 'success' and continued to be 'an active player in the investment industry' providing 'yields that are higher than those found elsewhere in the marketplace' when, in fact, by or before November 2007 all investors' money was gone, with many of the properties which purported to back the victims' investments in or approaching foreclosure?" (Doc. 191 at 31-32). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 60: "Isn't it true that Kevin Miller was rewarded for his participation in the conspiracy with cash commissions for his participation in the scheme?" (Doc. 191 at 33). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 5).

Question 61: "Isn't it true that in about June 2008, defendant Kevin Miller sought to conceal his participation and culpability in the scheme to defraud from state and federal investigators?" (Doc. 191 at 34). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 62: "Isn't it true that the Ohio Division of Securities ('ODS') is responsible for the regulation of the sale of securities in the State of Ohio and the enforcement of the Ohio Securities Act, which prohibits the sale of unregistered, non-exempt securities and the sale of securities through a scheme to defraud?" (Doc. 191 at 34). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6).

Question 63: "Isn't it true that in about June 2008, the ODS sent to each investor Diana Bradley and James Bradley a questionnaire pertaining to an ODS investigation then being conducted into the fraud scheme undertaken by CI/GMD?" (Doc. 191 at 34). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 6-7).

Question 64: "Isn't it true that the questionnaire sought information about Diana Bradley and James Bradley's investment in CI/GMD, including the amount and terms of the investment, and the name, date, and representations made by the individual who presented and obtained the investment of Diana Bradley and James Bradley?" (Doc. 191 at 34). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 65: "Isn't it true that the ODS investigation and questionnaire related to the conspiracy, which is a matter within the jurisdiction of a department or agency of the United States, that is, a matter involving the enforcement of federal laws by the Federal Bureau of Investigation, the U.S. Postal Inspection Service, and the U.S. Department of Justice?" (Doc. 191 at 35). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 66: "Isn't it true that after Diana Bradley and James Bradley received these Questionnaires from OSD, they contacted defendant Kevin Miller, who agreed to assist them in filling out the Questionnaires?" (Doc. 191 at 35). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 67: "Isn't it true that Diana Bradley and James Bradley each signed their questionnaire in blank, and gave both questionnaires to defendant Kevin Miller to fill out and return by mail to OSD?" (Doc. 191 at 35). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 68: "Isn't it true that Kevin Miller filled out each of the two questionnaires, one for Diana Bradley and one for James Bradley?" (Doc. 191 at 35). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 69: "Isn't it true that when he filled out the questionnaire, Kevin Miller falsely stated in each questionnaire that it was his co-conspirator, David Colwell, who contacted Diana Bradley and James Bradley to present and obtain their investment in CI/GMD?" (Doc. 191 at 35-36). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 70: "Isn't it true that Kevin Miller then well knew he was the person who presented and obtained the investments of Diana Bradley and James Bradley pursuant to the conspiracy, and that Diana Bradley and James Bradley had not met with nor had any contact with the co-conspirator at any time?" (Doc. 191 at 36). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 7).

Question 71: "Isn't it true that the victims included, among others, dozens of investors who invested and lost their life savings and retirements in the Ponzi-scheme perpetuated by Kevin Miller and his co-conspirators?" (Doc. 191 at 36). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 8).

Question 72: "Isn't it true that the fraud loss in this case exceeds $7.3 million, as a result of the defendant's conduct and that of his co-conspirators?" (Doc. 191 at 36). Inference: Yes. Independent evidence citation: (Doc. 192-1 at 8).

Question 73: "Isn't it true that you were convicted of federal crimes in connection with securities fraud?" (Doc. 191 at 41). Inference: Yes. Independent evidence citation: (Doc. 192-2).

## IV.    CONCLUSION

For good cause shown, and based on Defendants' failure to respond, Plaintiffs' Motion for Sanctions Against James D. Powell (Doc. 187) and Motion for Sanctions

Against Kevin Miller (Doc. 192) are hereby **GRANTED** and the Court draws the

negative inferences described above.[1]

      **IT IS SO ORDERED.**

Date:  <u>11/4/13</u>                                                  <u>*s/ Timothy S. Black*</u>
                                                              Timothy S. Black
                                                             United States District Judge

---

[1] As Plaintiff Bradley has withdrawn her Requests for Admissions 41-154 based on her Motion for Sanctions (Doc. 187 at 1), Defendant Powell's Motion for Protective Order (Doc. 145) is hereby **DENIED** as **MOOT**.