## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DIANA BRADLEY, *et al.*,                :        Case No. 1:10-cv-760
                                        :
     Plaintiffs                     :        Judge Timothy S. Black
                                        :
vs.                                     :
                                        :
KEVIN MILLER, *et al*.,                 :
                                        :
     Defendants.                    :

## ORDER:
## (1) GRANTING DEFENDANT CURTIS POWELL'S MOTION
## FOR SUMMARY JUDGMENT (Doc. 198);
## (2) GRANTING DEFENDANT JAMES WILBURN POWELL'S MOTION
## FOR SUMMARY JUDGMENT (Doc. 205); AND
## (3) GRANTING IN PART AND DENYING IN PART
## PLAINTIFFS DIANA AND JAMES BRADLEY'S MOTION
## FOR SUMMARY JUDGMENT (Doc. 208)

This civil action is before the Court on (1) Defendant Curtis Powell's motion for

summary judgment (Doc. 198), (2) Defendant James Wilburn Powell's motion for

summary judgment (Doc. 205), (3) Plaintiffs' motion for summary judgment (Doc. 208),

and the parties' responsive memoranda (Docs. 217, 221, 227, 242, 243, 244, and 245).

## I.        BACKGROUND

Plaintiffs Diana and James Bradley allege they were the victims of a real estate

securities Ponzi scheme in which they lost at least $134,354.46.[1]  Plaintiff Cora Pyles

---

[1] James Bradley passed away during this litigation and his wife Diana was substituted as his
fiduciary on June 11, 2013.

alleges she lost $50,000 in a separate investment.[2]  Plaintiffs first filed this action on October 29, 2010.  (Doc. 1).  Twenty months later on May 17, 2012, Plaintiffs filed an amended complaint asserting a total of twelve claims against ten Defendants, including five new Defendants first named in the amended complaint.  (Doc. 46).  The claims against three individual Defendants have since been dismissed, and those persons are no longer parties to this litigation.[3]

Four individuals and three business entities remain as Defendants.  The individual Defendants include James D. Powell ("James D."), James Wilburn Powell ("James Wilburn"), Curtis Powell ("Curtis"), and Kevin Miller.  James D. was the president of the three business entity Defendants, Capital Investments ("CI"), Great Miami Debentures ("GMD"), and Great Miami Real Estate, LLC ("GMRE").  (Doc. 208, Ex. 9).  James Wilburn is the father of James D. and the uncle of Curtis.  James D. and Curtis are cousins.

Count one of the amended complaint is asserted by Pyles against Miller for violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R § 240.10b-5.  (Doc. 46 at 28-29).  This is the only claim brought by Pyles, and it is not part of the summary judgment motions before the Court.  (Doc. 182).  The remaining counts were originally pleaded by the Bradleys against all ten Defendants.

---

[2] Diana Bradley is the attorney-in-fact for her mother Cora Pyles and proceeds on her behalf. (Doc. 182 at 2).

[3] Pursuant to separate joint motions to dismiss, Hubert Rials and Deanna Powell were dismissed with prejudice on October 7, 2013 and December 13, 2013, respectively.  Subsequently, on January 2, 2014, Chatsworth Jacobs was dismissed without prejudice.

Counts two through five of the amended complaint assert violations of each of the four subsections of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  Counts six and seven assert a violation and a conspiracy to violate the Ohio Corrupt Practices Act ("OCPA"), Ohio Rev. Code § 2923.32.  Counts eight, nine, and ten assert claims for fraud, breach of contract, and negligence.  Count eleven asserts a claim for fraudulent transfer under Ohio law, Ohio Rev. Code § 1336.04, and count twelve asserts a common law claim for civil conspiracy.  By stipulation, Plaintiffs have narrowed the scope of the claims against James Wilburn and Curtis to OCPA, OCPA conspiracy, fraudulent transfer, and civil conspiracy.  (Docs. 76, 87).

Defendants CI, GMD, and GMRE failed to answer or otherwise defend in this case and, on August 22, 2013, the Court entered default judgment as to liability and damages.  (Doc. 188).  The Court found that Defendants CI, GMD, and GMRE were jointly and severally liable for $403,063.40 in damages, plus an additional amount, to be determined, of attorney's fees and costs.  (*Id.* at 5).[4]

Now pending before the Court are three motions for summary judgment.  James Wilburn and Curtis move for judgment as a matter of law on the four claims asserted against them.  (Docs. 198, 205).  Plaintiffs filed a motion for partial summary judgment against the four remaining individual Defendants.  (Doc. 208).  Specifically, Plaintiffs filed a cross motion for summary judgment against James Wilburn and Curtis on the OCPA and OCPA conspiracy claims.  (Doc. 208).  Plaintiffs also move for summary

---

[4] The Court will address Plaintiffs' pending motion for attorney's fees and costs (Doc. 237)  by separate entry.

judgment against James D. and Miller on their claims for OCPA, OCPA conspiracy, and one RICO count.  (*Id.*)[5]

James D. and Miller did not respond to the summary judgment motion filed against them.  Prior to moving for summary judgment, Plaintiffs filed motions for adverse inferences against James D. and Miller after both refused to answer questions at their depositions based on their Fifth Amendment rights against self-incrimination.  (Docs. 187, 192).  Neither filed a responsive memorandum.  After dispositive motion briefing closed, the Court granted the motions and drew adverse inferences on forty-eight questions asked to James D. and seventy-three questions asked to Miller.  (Doc. 250).[6]

## II.    UNDISPUTED FACTS

### A.    Criminal Charges

James D. and Miller pled guilty to federal criminal charges,[7] based on their involvement in the real estate securities Ponzi scheme that now forms the basis for this civil action.  Specifically, James D. and Miller both pled guilty to a charge of conspiracy to commit mail fraud; James D. pled guilty to an additional charge of wire fraud; and Miller pled guilty to obstruction of investigation.  As part of their plea agreements, each signed a statement of facts admitting to the underlying conduct.  (Doc. 192, Ex. 1; Doc.

---

[5] Counts two through five alleged RICO claims under each of the four provisions of 18 U.S.C. § 1962.  (Doc. 46 at 29).  However, as the Court discusses more fully *infra*, Plaintiffs only moved for summary judgment on count four, which alleges a violation of 18 U.S.C. § 1962(c).

[6] An adverse inference applies only against that particular Defendant.

[7] *United States v. Kevin Miller*, 1:09-cr-176 (S.D. Ohio); *United States v. James D. Powell*, 1:10-cr-75 (S.D. Ohio).

208, Ex. 9).[8] On November 20, 2009, Miller signed his statement of facts and admitted to his role in a Ponzi scheme that defrauded more than 80 victims out of over $7.3 million. (Doc. 192, Ex. 1 at 2, 4). On June 2, 2010, James D. also admitted to his role in the Ponzi scheme, which at that time was calculated to have defrauded over 90 victims out of a total of $9.2 million. (Doc. 208, Ex. 9 at 8).

The Ponzi scheme began to form in approximately 2002 when James D. formed CI, GMD, and GMRE. (Doc. 208, Ex. 9 at 1). James D. and his wife transferred real estate valued at over $2 million to GMRE in 2002. (Doc. 163 at 28). GMRE purchased, sold, and managed a portfolio of real estate properties. (*Id.* at 16). CI held itself out as an investment company offering attractive rates of return on investments evidenced by promissory notes that were purportedly backed by the real estate portfolio of properties owned and managed by either CI or GMRE. (Doc. 208, Ex. 9 at 1). GMD purported to issue mortgage security promissory notes on real estate properties owned by GMRE. (*Id.* at 2).

James D.'s statement of facts indicates that promissory notes and mortgage security notes evidencing an investment backed by a debt instrument, such as those offered by CI and GMD throughout the course of the investment scheme, constitute securities within the meaning of federal and state securities laws. (Doc. 208, Ex. 9 at 2). Securities laws require that any firm offering the sale of securities must be registered and any person selling securities must be licensed as a securities salesperson. (*Id.*) CI, GMD,

---

[8] James D. and Miller were prosecuted in separate cases and each statement of facts refers to two unnamed co-conspirators. However, it is undisputed that James D., Miller, and David Colwell were members of the same conspiracy to commit mail fraud.

and GMRE were not registered with the Ohio Division of Securities to sell securities.
(*Id.*)  James D. was never licensed as a securities salesperson.  (*Id.*)  Miller and Colwell
were previously licensed as securities salespersons, but in 1999 and 2001 they were
ordered by the Ohio Division of Securities to cease and desist in the sale of fraudulent
unregistered securities.  (*Id.*)  Both surrendered their licenses at the time and were not
registered securities salespersons when they sold the securities offered by CI and GMD.
(*Id.*)

Around 2002, James D. and David Colwell, who was the owner of Midwest
Marketing Alliance ("MMA"), agreed to a plan using their respective business entities.
(Doc. 163 at 27).[9]  Colwell recruited investors, while James D. purchased and managed
real estate.  (*Id.*)  Miller became involved in 2004 or 2005 when he began to work as a
salesperson for CI recruiting investors and selling securities.  (Doc. 192, Ex. 1 at 5).
Miller sought investors for CI and GMD by falsely representing that the investments
were safe and would be backed by income-producing properties owned by a local real
estate development firm.  (*Id.*)

The Ponzi scheme primarily targeted elderly, unsophisticated, and inexperienced
investors.  (Doc. 192, Ex. 1 at 1; Doc. 208, Ex. 9 at 3).  The victims were induced to roll
over their pre-existing IRA's into investments in promissory notes or debt investments
offered by CI and GMD.  (Doc. 208, Ex. 9 at 3).  James D. and Colwell arranged for

---

[9] Despite knowing that Colwell died in March 2008, Plaintiffs named Colwell and MMA as
Defendants in their original complaint.  (Doc. 1 at ¶ 11).  The Court was forced to issue several
orders before Plaintiffs finally conceded that they had no intention of pursuing those claims.
(Docs. 21, 28, 33).

Fiserv, an unaffiliated and presumably innocent entity, to serve as the IRA
trustee/custodian for self-directed IRA accounts. (*Id.* at 2-3). On November 3, 2004,
James D. executed a Declaration of Administrative Feasibility to establish retirement plan
accounts with Fiserv for investments into CI and GMD. (*Id.* at 3). James D. falsely
agreed on behalf of CI and GMD to provide investors "with all information and
documentation regarding their investments." (*Id.* at 4). Fiserv served as the
trustee/custodian over the investors' IRA accounts for tax purposes only. (*Id.*) Colwell
was named as the Servicing Agent, which is required to be a "disinterested independent
third party entity or individual," to carry out certain responsibilities on behalf of the note
holders or investors. (*Id.* at 3) Most importantly, the Servicing Agent was tasked with
overseeing repayments to investors. (*Id.* at 4). In reality, Colwell personally obtained the
investors' funds and converted them to further the Ponzi scheme and for Defendants' own
personal use. (*Id.*)

James D. and Miller admitted to participation in a conspiracy that made false
representations and promises, and failed to disclose known material information, to
investors in order to induce them to invest money in CI and GMD. (Doc. 208, Ex. 9 at 4-
6). Specifically, the conspirators falsely promised guaranteed annual interest rates that
exceeded the investors' current investment rates and falsely represented that the
investments were safe and 100% guaranteed. (*Id.* at 4) Further, the conspirators falsely
represented that the investments were backed by equity in real estate purchased or
developed with investor monies and owned by CI or GMRE. (*Id.* at 4-5). However,
many of the properties were not even owned by CI or GMRE. (*Id.*) James D. prepared at

least two versions of a document titled Real Estate Portfolio, which purported to list the properties backing the investments in CI by address, value, debt, income, and monthly payment. (*Id.* at 5; Doc. 246, Ex. A). The first version of the Real Estate Portfolio dated December 3, 2002 falsely stated that CI owned thirteen properties with a total value of $4.8 million. (Doc. 246, Ex. A at 1-2). The final version dated September 15, 2007 falsely stated that CI had increased its portfolio to forty properties with an overall equity of approximately $10.5 million. (*Id.* at 3-7). A number of properties listed in the Real Estate Portfolio were not owned by CI or GMRE, and the property value and equity were falsely inflated. (Doc. 208, Ex. 9 at 5). By November 2007, the few properties actually owned by CI or GMRE lacked substantial equity, were in a state of disrepair, were in default, or were in various stages of foreclosure. (Doc. 208, Ex. 9 at 5).

By November 2007, the Ponzi scheme had squandered the investors' money. (Doc. 208, Ex. 9 at 5). Nonetheless, CI and GMD continued to produce monthly account statements falsely listing each investor's principal investment and interest earned. (*Id.*) James D., Miller, and Colwell scrambled each month to come up money to make monthly interest payments to certain investors. (*Id.*) The Ponzi scheme continued to solicit new investors, using that money to make interest payments to earlier investors and keeping the remainder for their own personal living expenses. (*Id.* at 5-6).

James D., as president of CI, sent periodic letters to investors assuring them that their investments were doing well. (*Id.* at 6). On January 8, 2008, James D. sent a letter falsely stating that CI was an active player in the investment industry and was producing yields well above the market average. (*Id.*) In late January 2008, the investors' money

was completely gone, leaving CI and GMD unable to make any monthly interest payments. (*Id.* at 8). Colwell refused to continue to contact investors and demanded that his address be removed from the companies' materials. (*Id.* at 8). On February 5, 2008, James D. wrote a letter to investors advising them of a "minor change" in the mailing address of CI due to "some restructuring within the company," but provided no indication that the investors' money was completely gone. (*Id.*) On March 4, 2008, Colwell committed suicide by shooting himself in the head. (Doc. 108-8, Ex. 1 at ¶ 4; Doc. 162 at 18; Doc. 200 at 139).

On January 10, 2010, Miller entered a guilty plea to charges of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, and obstruction of investigation in violation of 18 U.S.C. § 1519. (Doc. 192, Ex. 1). He was sentenced to fifteen months imprisonment.

On June 28, 2010, James D. pled guilty to conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, and wire fraud in violation of 18 U.S.C. § 1343. (Doc. 208, Ex. 9). The wire fraud conviction resulted from a series of real estate purchases and mortgage loan applications completed between 2000 and 2005. (*Id.* at 8-10). In 2000, James D. purchased a total of six properties for $750,000. (*Id.* at 8). The purchase price was financed through multiple bank mortgage loans and a promissory note and mortgage with the sellers. (*Id.*) On October 15, 2003, James D. defaulted on a balloon payment on the loan from the sellers, instead making on monthly interest payments. (*Id.* at 9). In November 2005, James D. sought to refinance one of the properties purchased in 2000. (*Id.*) On November 14, 2005, James D. signed a mortgage loan application that falsely

inflated his income, listed a non-existent asset, and failed to disclose a substantial outstanding loan in default. (*Id.* at 10). In total, the banks and the real estate sellers lost $944,848 from James D.'s wire fraud scheme. (*Id.*)

On September 28, 2010, James D. was sentenced to 121 months imprisonment. James Wilburn made a brief, unsworn statement at his son's sentencing hearing in an attempt to offer mitigating factors. (Doc. 205, Ex. B at 33-37).

### B. Bradleys' Involvement in the Investment Scheme

Plaintiffs Diana and James Bradley first met Miller in 1996 when Miller was selling insurance. (Doc. 173-1 at ¶¶ 4-5).[10] Miller sold insurance policies to the Bradleys and helped them establish a trust. (*Id.*) On Miller's recommendation, James Bradley transferred approximately $66,000 into an annuity with Northwestern Insurance Company. (*Id.* at ¶ 7).

In 2005, the Bradleys contacted Miller for assistance in making a change to James Bradley's Northwestern annuity, which at that time had grown in value to $88,362.23. (Doc. 173-1 at ¶¶ 19, 23). Diana Bradley also had an annuity worth $45,990.77. (*Id.* at ¶ 28). Miller used the opportunity to pitch the Bradleys on the benefits of investing in CI. (*Id.* at ¶ 20). Miller told the Bradleys that CI was invested in locally-owned real estate,

---

[10] Diana Bradley's affidavit contains a significant number of conclusions of law as well as factual statements not based on her personal knowledge and. (Doc. 173 at ¶¶ 85-249, 252). "When ultimate facts or conclusions of law appear in an affidavit which also contains the proper subject of affidavit testimony, facts within the personal knowledge of the affiant, the extraneous material should be disregarded, and only the facts considered." *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 121 (6th Cir. 1981). Accordingly, the Court disregards those portions of the affidavit and only considers paragraphs 1-84 and 250-51. The Court similarly disregards the portions of her deposition testimony, which is too extensive to list here, that are not based on personal knowledge or contain conclusions of law. (*See, e.g.*, Doc. 203 at 118-21).

that CI's guaranteed interest rate of 6.65% exceeded their current annuities, and that CI was a very safe investment.  (*Id.* at ¶¶ 20-26; Doc. 192, Ex. A at 5).  Based on their discussions with Miller, the Bradleys transferred their annuities, worth a total of $134,353, to investments with CI.  (Doc. 173-1 at ¶¶ 23, 28).

On June 1, 2005, the Bradleys received account statements from CI signed by James D.  (Doc. 173-1 at ¶ 29).  Diana Bradley also received statements from Fiserv, which stated that her money had been transferred to GMD promissory notes.  (*Id.* at ¶ 35).  The Bradleys continued to receive periodic statements from CI and Fiserv from June 2005 to May 2008.  (*Id.* at ¶ 37).

On May 22, 2008, Diana Bradley received a letter from Fiserv stating that the GMD promissory notes where her money was invested had been administratively dissolved.  (Doc. 110-18 at 20; Doc. 173-1 at ¶ 38).  An account statement dated September 30, 2008 provided that Diana Bradley's Fiserv IRA account had a balance of $55.58.  (Doc. 110-18 at 21).

In June 2008, the Bradleys received written questionnaires from the Ohio Department of Commerce, Division of Securities requesting information about their investments in CI.  (Doc. 173-1 at ¶ 46).  The Bradleys contacted Miller for assistance in completing the questionnaires, signed the questionnaires in blank, and then permitted Miller to complete and return the questionnaires on his own.  (*Id.* at ¶ 47; Doc. 192, Ex. 1 at 7).  Miller falsely stated on the questionnaires that Colwell had recruited the Bradleys to invest in CI.  (Doc. 173-1 at ¶ 50; Doc. 192, Ex. 1 at 7).  This conduct resulted in Miller's criminal conviction for obstruction of investigation.  (Doc. 192, Ex. 1 at 7).

### C.    James Wilburn

In December 2002, James Wilburn and his wife Betty Powell entered into a Land Contract to sell a mobile home park called Midwest to GMRE for $600,000.  (Doc. 198, Ex. A).  The Land Contract required James D. to make a $100,000 down payment and pay the remaining balance in $4,000 monthly payments at 6% interest.  (*Id.* at ¶ 2). James Wilburn and Betty retained title to Midwest until GMRE paid the full balance of the purchase price.  (*Id.* at ¶ 16).  The Land Contract prohibited GMRE from assigning its interest without consent.  (*Id.* at ¶¶ 7, 17).  James D. made timely monthly payments of $4,000 from January 2003 to April 2006, which amounted to over $160,000 in payments. (Doc. 200 at 59-60).

On May 1, 2007, after James D. failed to make several monthly payments on Midwest, James Wilburn and James D. executed a Mutual Release of Land Contract, which cancelled the 2002 Land Contract for Midwest.  (Doc. 198, Ex. G).  The Mutual Release of Land contract recited that James D. owed over $466,000 on Midwest, that James D. failed to make the required monthly installment payments since May 2006 and had failed to pay the real estate taxes since 2005, and that James Wilburn had loaned $120,000 to James D.  (*Id.*)  On June 28, 2007, James D. executed a Quit Claim Deed on behalf of GMRE to transfer any remaining interest in Midwest to his parents James Wilburn and Betty.  (Doc. 208-16).  Also on June 28, 2007, James Wilburn transferred Midwest to Curtis through a General Warranty Deed.  (Doc. 198, Ex. O).

James Wilburn and Betty made several loans or payments to their son James D. in 2006 and 2007.  On November 10, 2006; December 21, 2006; June 29, 2007; and April 4,

2008, James Wilburn wrote four checks to James D. for a total of $80,500.  (Doc. 208-20; Doc. 216, Ex. 23 at 23, 26, 44).  Three of the checks were made payable to James D. personally, while the $32,500 check dated June 29, 2007 was made payable to CI.  (Doc. 208-20).  On September 14, 2006, Betty transferred $10,000 from her First Financial checking account to James D.  (Doc. 216, Ex. 23 at 13).  On November 1, 2006, Betty transferred another $20,000 to James D.  (*Id.* at 22).  Between September 6, 2007 and October 15, 2007, Betty purchased four cashier's checks totaling $59,000 from her Fifth Third account made payable to James D.  (*Id.* at 35, 37, 40, 41).  Betty first opened her Fifth Third checking account in July 2007 and the account was solely in her name, James Wilburn was not authorized to make transactions.  (Doc. 200 at 112).

### D.    Curtis

Curtis moved from Georgia to Ohio in 2003.  (Doc. 195 at 96).  Between 2003 and 2006, he saw his cousin James D. very infrequently, typically only on Christmas Eve and at the large church both attended.  (*Id.* at 12).  In the summer of 2006, Curtis worked construction for a company that purchased, refurbished, and then resold foreclosed homes.  (Doc. 195 at 8).  Curtis also assisted in finding and viewing foreclosed homes for the company to purchase.  (*Id.* at 8-9).  Curtis had never owned rental property, but he had a long-standing interest in doing so and kept an eye out for a property to personally purchase.  (*Id.*)

Curtis found a six-family apartment for sale by the owner and was quoted a price.  (Doc. 195 at 9-10).  No knowing whether this was a fair price, Curtis sought the opinion of his cousin James D., whom Curtis thought owned two nearby 12-family apartment

13

complexes (*Id.*)  James D. said it was not a good price, and the two did not speak again for quite some time.  (*Id.*)

Several weeks later, in late September or early October 2006, Curtis was performing construction work on a home listed for sale by his employer when James D.'s daughter and son-in-law came to view it.  (Doc. 195 at 8, 10-11).  About one week later, James D. called Curtis to arrange to view the home himself.  (*Id.* at 10-11).  James D. invited Curtis to lunch afterwards, which Curtis thought was to continue their conversation about the house.  (*Id.* at 11-12).

James D. used the lunch to pitch Curtis on an investment opportunity.  (Doc. 163 at 122-23; Doc. 195 at 13-14).  James D. told Curtis that he had entered a land contract with his father James Wilburn in 2002 to purchase Midwest for $600,000, that he made a $100,000 down payment, and that he owed another $425,000.  (Doc. 163 at 122-26; Doc. 195 at 13-14).  James D. told Curtis that he owned several other properties and could use Curtis' help to manage and maintain Midwest.  (Doc. 163 at 122-26; Doc. 195 at 13-15).  James D. also told Curtis that he planned to refinance Midwest to help purchase another mobile home park called 8000 Hamilton.  (Doc. 195 at 14-15).  Then James D. told Curtis that the two could be equal partners on Midwest, which James D. said was worth $725,000, if Curtis came up with $50,000,.  (Doc. 163 at 122-23; Doc. 195 at 14-15).  James D. said he would put Curtis' $50,000 in an interest bearing savings or escrow account while James D. arranged the refinancing.  (Doc. 195 at 15).  Curtis, who expected the lunch conversation to center on whether James D.'s daughter should purchase the house, was caught completely off guard and asked for time to think over

14

James D.'s investment offer.  (*Id.*)  James D. did not mention that he was in default on the Midwest installment payments, that he did not hold title to Midwest, or that the other properties he owned were in various stages of foreclosure.  (*Id.*)

James D. called Curtis about a week later to follow up on the investment offer. (Doc. 195 at 15-16).  Curtis spoke with his father about the opportunity and then requested further information from James D.  (*Id.*)  James D. told Curtis that Midwest brought in $9,000 per month in rent, that the installment payments were $4,000 per month, and that the utility payments were such that Midwest turned a profit each month. (*Id.* at 15-17).  Curtis returned again to his father, who agreed to loan Curtis the $50,000 because he felt that Curtis' grandfather would be happy that the cousins were going into business together.  (*Id.* at 17).

Curtis wrote a $50,000 check to James D. on October 18, 2006.  (Doc. 195 at 17-18; Doc. 198, Ex. B).  The two opened a joint checking account for their purported business and Curtis deposited $50 from his personal account.  (Doc. 195 at 17-18). James D. told Curtis that he deposited the $50,000 check in a separate savings or escrow account to accrue interest before it went towards a down payment on 8000 Hamilton. (Doc. 195 at 15, 17-19, 31, 134-35).  In reality, James D. spent the $50,000 almost immediately, something Curtis did not learn until late March 2007.  (*Id.* at 31, 135-35). On November 13, 2006, Curtis met with Barbara Hoffman from Coldstream Financial Services to apply for financing in anticipation of purchasing 8000 Hamilton.  (Doc. 218 at ¶ 10).

On December 29, 2006, Curtis and James D. officially formed a company called C&J Property Enterprises, LLC.  (Doc. 198, Ex. C).  James D. worked with an attorney to draft the paperwork, which Curtis did not see or know about prior to the day of signing.  (Doc. 195 at 104-07).  An Operating Agreement and attached Exhibit 8.1 set forth their respective contributions and provided that each would hold a 50% interest.  (*Id.*, Exs. C and D).  Curtis' contribution was the $50,000 delivered to James D. two months earlier, which Curtis was unaware had already been spent.  (*Id.*, Ex. D).  James D.'s contribution was to be $50,000 in equity gained from the future refinancing of Midwest and two other properties.  (*Id.*)  According to the agreement, James D. would refinance the properties and then transfer them to C&J, with James D. to retain any excess proceeds.  (*Id.*)  However, Curtis and James D. had a verbal agreement that the excess proceeds from the refinancing would go towards the down payment on 8000 Hamilton.  (Doc. 195 at 108).  Curtis had not heard about the other two properties set forth in the Operating Agreement.  (*Id.* at 106-08).  James D. told Curtis that the bank had made a mistake with a mortgage payment on those properties, but assured Curtis that he would resolve the matter soon.  (*Id.*)  Unbeknownst to Curtis, those properties were already foreclosed upon and James D. held no interest at the time.  (*Id.* at 105-09).

On January 1, 2007, James D. and Curtis signed an Assignment of Land Contract drafted by James D.  (Doc. 198, Ex. E).  The contracted purported to assign Midwest from GMRE to C&J.  (*Id.*)  Curtis gave James D. the assignment to file with the recorder's office.  (Doc. 195 at 27, 110, 153, 184; Doc. 198, Ex. E).  Curtis thought that C&J owned Midwest on January 1, 2007 and began managing and maintaining Midwest

for the next three months.  (Doc. 195 at 26, 154).  However, the assignment had no effect

because the Land Contract required James Wilburn and Betty to consent to any

assignment.  (Doc. 198, Ex. A at ¶¶ 7, 17)).  James D. had never shown the Land Contract

to Curtis, and Curtis was unaware that it contained an anti-assignment provision.  (Doc.

195 at 14-15).  James Wilburn had not given consent and did not learn about the

purported assignment until late March 2007.  (Doc. 200 at 77).  To help conceal the

assignment from James Wilburn, James D. delayed filing the assignment with the

recorder's office until April 3, 2007.  (Doc. 198, Ex. E).

In January 2007, James D. approached Howard Robinson to purchase an

apartment duplex called Marlou.  (Doc. 197 at 8-11).  Robinson first met James D. in late

2006.  (*Id.* at 6).  Robinson described James D. as a person desperate for money but also a

charismatic and persuasive salesman.  (*Id.* at 6-7).  For example, James D. successfully

convinced Robinson to purchase a gun from James D. for $700 even though Robinson

knew the gun was worth significantly less.  (*Id.* at 6-7).  On January 23, 2007, James D.

and Robinson signed a contract to purchase Marlou for $235,000.  (*Id.* at 9-10; Doc. 218,

Ex. K).  As part of the negotiations, Robinson loaned James D. $20,000, which James D.

promised to repay at the closing.  (Doc. 197 at 13; Doc. 224 Ex. B).  On the memo line of

the check, Robinson wrote that the money was for Marlou.  (Doc. 224 Ex. B).  Robinson

repeatedly testified that James D. presented himself as the buyer of Marlou in January

2007 and that James D. never mentioned Curtis or C&J.  (Doc. 197 at 8, 10-11, 15).

James D. first spoke with Curtis about purchasing Marlou in late February 2007

and told Curtis that they needed $21,750 for the down payment.  (Doc. 195 at 21-23).

James D. convinced Curtis that they would use only $16,000 of Curtis' $50,000 initial investment towards the down payment. (*Id.* at 22-23). James D. had told Curtis that his $50,000 was deposited in a savings or escrow account to which Curtis did not have access, and Curtis remained unaware that this money was gone. (*Id.* at 15, 134-35).

The closing on Marlou occurred on March 2, 2007. (Doc. 195 at 22). Only minutes before the closing began, James D. approached Robinson in the parking lot to tell Robinson that Curtis and his wife would be the real purchasers of Marlou. (Doc. 197 at 16-17, 35, 39). Robinson was caught completely off guard because James D. had discussed purchasing Marlou himself and Robinson had never heard of Curtis before. (*Id.*) Robinson testified that he received only $175,000 of the $215,000 purchase price at the Marlou closing. (*Id.* at 19-22). Robinson first realized this discrepancy during the closing, which also attended by at least one title agent. (*Id.*) James D. silently mouthed to Robinson that he would take care of the $40,000 difference, in addition to repaying the $20,000 loan James D. had promised to repay at the closing. (*Id.*) Robinson trusted James D. at the time so he took James D. at his word. (*Id.* at 65). Robinson repeatedly testified that James D., not Curtis or Wilburn, owed Robinson the outstanding $60,000. (Doc. 197 at 21, 27, 40, 50, 56).

Curtis began to realize that James D. had defrauded him in late March 2007. First, James Wilburn told Curtis that C&J did not own an interest in Midwest because the Land Contract required James Wilburn's consent for the purported assignment of Midwest to C&J. (Doc. 200 at 68-71, 77). Curtis also learned that James D. had lied about making the $4,000 monthly installment payments to James Wilburn. (Doc. 195 at 25-26, 28).

James D. had been deducting money from the Midwest rent payments and told Curtis the money went to James Wilburn. (*Id.*) However, James D. actually spent that money on personal expenses. (*Id.*) Curtis believed that he had owned an interest in Midwest for three months and attempted to pay the three missed installment payments in an attempt to salvage his investment; however, James Wilburn refused to accept the money out of fear that doing so would tacitly recognize Curtis as a partial owner. (*Id.*) Still desperate to save his investment, Curtis gave $12,000 to James D. so that he could make the installment payments to James Wilburn. (*Id.* at 73-74). Later in March 2007, Curtis first learned that James D. had spent his initial $50,000 investment on personal expenses. (*Id.* at 31, 134-35).

On April 2, 2007, three months after forming C&J with James D., Curtis dissolved C&J and terminated the Operating Agreement. (Doc. 198, Exs. H, I). On April 17 and 26, 2007, Curtis reorganized C&J and declared himself the sole member. (*Id.*, Exs. J, K). Additionally, Curtis removed James D. from the C&J checking account and changed the key to the post office box the two had previously shared. (Doc. 195 at 33-34, 149).

On April 6, 2007, James D. wrote three postdated checks to Robinson for a total of $40,000. (Doc. 197 at 27; Doc. 224, Ex. G). The three checks bounced when Robinson attempted to cash them in early May 2007. (Doc. 224, Ex. H). Robinson called Curtis soon after to tell Curtis that the checks bounced and threatened to call the sheriff on James D. (Doc. 195 at 21; Doc. 197 at 28). On June 13, 2007, James Wilburn repaid his son's $20,000 to Robinson to prevent the situation from escalating with law enforcement. (Doc. 183-5 at 3).

Between April and June 2007, Curtis and James Wilburn had extensive discussions regarding Curtis purchasing Midwest directly from James Wilburn. (Doc. 195 at 31; Doc. 200 at 68-71, 77). James Wilburn was impressed with Curtis' management of Midwest, particularly the manner in which Curtis collected rent and maintained the property. (Doc. 195 at 111-12, 129, 136). Eventually the two reached an agreement for Curtis and his wife to purchase Midwest for $700,000. (Doc. 200 at 77-78).

On May 1, 2007, Curtis signed a quitclaim deed conveying any interest C&J had in Midwest back to GMRE. (Doc. 198, Ex. L). Also on May 1, 2007, James Wilburn and James D. executed a Mutual Release of Land Contract, which cancelled the 2002 Land Contract for Midwest. (*Id.*, Ex. G). The Mutual Release of Land Contract recited that James D. owed over $466,000 on Midwest, that James D. failed to make the required monthly installment payments since May 2006 and had failed to pay the real estate taxes since 2005, and that James Wilburn had loaned $120,000 to James D. (*Id.*)

James D. called Curtis in early June 2007 to request a $10,000 commission for his role in the Midwest sale. (Doc. 195 at 65-68). On June 14, 2007, Curtis agreed to the commission because James D. was the only reason that Curtis knew about Midwest and wrote a $10,000 check to James D. (*Id.*; Doc. 198, Ex. N).

On June 28, 2007, James Wilburn and his wife sold Midwest to Curtis and his wife for $700,000 and transferred title through a General Warranty Deed. (Doc. 1945 at 52; Doc. 198, Ex. O). Also on June 28, 2007, Curtis and his wife purchased 8000 Hamilton from a couple who are not involved in this litigation. (Doc. 195 at 49, 103). Curtis and his wife signed loan applications for the financing on Midwest and 8000 Hamilton, and a

HUD-1 statement for Midwest. (Doc. 221-3; Doc. 224, Exs. J, O).  Curtis met with

Barbara Hoffman in February 2007 to complete the loan application.  (Doc. 195 at 61).

Curtis and his wife received a $38,500 loan towards his purchase of 8000

Hamilton and a $682,500 loan on the refinance of Midwest.  (Doc. 221-3; Doc. 224, Ex.

O).  Wilburn received a check for $469,500 from Silver Hill Financial as part of the

purchase price for Midwest.  (Doc. 200 at 97; Doc. 216-8).  Curtis also executed a

$215,000 promissory note to James Wilburn, which was secured by a mortgage.  (Doc.

243-3).

Curtis did not speak with James D. again until early September 2007, when James

D. approached Curtis in a very desperate manner talking about suicide.  (Doc. 195 at 69-

72).  James D. said that he needed money to pay the mortgage on his own house and

adamantly asserted that he held equity in Midwest.  (*Id.*)  Curtis was particularly sensitive

to suicide because years earlier another cousin committed suicide and Curtis watched the

children grow up without a father.  (*Id.* at 70).  Eventually Curtis borrowed $12,000 from

another family member and wrote a check on September 12, 2007, which Curtis hoped

would prevent his cousin James D. from also committing suicide.  (*Id.*; Doc. 198, Ex. P).

It was not until Colwell committed suicide in March 2008 that Curtis learned that James

D.'s properties were in foreclosure and that James D. had taken money from other

investors.  (Doc. 195 at 174, 181).

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  Where a "party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2)."

"[J]udges are not like pigs, hunting for truffles that might be buried in the record." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011).  It is counsel's responsibility and obligation "to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out."  *Wimbush v. Wyeth*, 619 F.3d 632, 639 n.4 (6th Cir. 2010). The Court will not "*sua sponte* comb the record from the partisan perspective of an advocate."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 410 (6th Cir. 1992). Rather, counsel must "identify this evidence and craft these arguments" supported by "specific citations to particular portions of the record."  *Emerson*, 446 F. App'x at 736. "[T]he designated portions of the record must be presented with enough specificity that

the district court can readily identify the facts upon which the [moving or] nonmoving

party relies." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).[11]

## IV. FRAUDULENT TRANSFER

James Wilburn and Curtis argue that Plaintiffs' fraudulent transfer and civil

conspiracy claims are barred by the statute of limitations.

A claim under the Ohio Uniform Fraudulent Transfer Act ("UFTA") requires

proof that a debtor made a transfer or incurred an obligation "with actual intent to hinder,

delay, or defraud any creditor of the debtor." Ohio Rev. Code § 1336.04(A)(1). The

UFTA was enacted to "create a right of action for a creditor to set aside an allegedly

fraudulent transfer of assets." *Esteco, Inc. v. Kimpel*, No. 07-co-3, 2007 Ohio App.

LEXIS 6323, at *4 (Ohio App. Dec. 20, 2007).

"The tort of civil conspiracy is a malicious combination of two or more persons to

injure another in person or property, in a way not competent for one alone, resulting in

actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). "An

underlying unlawful act is required before a civil conspiracy claim can succeed." *Id*

Plaintiffs' UFTA and civil conspiracy claims relate to the Mutual Release of Land

Contract and Quit Claim Deed divesting James D. of any interest in Midwest, and James

Wilburn's subsequent transfer of Midwest to Curtis. James Wilburn and Betty executed a

---

[11] Beyond the sheer volume of exhibits submitted, the Court's ability to address the pending motions was particularly hindered by Plaintiffs' inconsistent and confusing labeling of exhibits and citations thereto. Among the various labels are appendix, deposition exhibit, deposition document, tab, and admission, often used in combination. For example, record citations include "Depo. Exh. 23, at Depo. Doc. 26," "Appx A, Exh. 48, at 17057-61," "Exh, 9, Tab 139, 1599," and "Depo Exh. 9, at Tab 89." Frequently the pincite is to a five-digit Bates number, but the pages in exhibits are often not organized sequentially.

General Warranty Deed on June 28, 2007, transferring title to Midwest to Curtis and his wife.  (Doc. 198, Ex. O).  The Mutual Release of Land Contract was recorded on June 6, 2007.  (*Id.*, Ex. G).  The Quit Claim Deed and General Warranty Deed were both properly recorded on July 10, 2007.  (*Id.*, Ex. O; Doc. 208-16).  Finally, Curtis' $215,000 mortgage to James Wilburn was recorded on August 20, 2007.  (Doc. 243-3).

James Wilburn and Curtis contend that the UFTA and civil conspiracy claims related to the 2007 transfer of Midwest are barred by the statute of limitations.  The UFTA provides that an actual fraud claim under § 1336.04(A)(1) is "extinguished unless an action is brought . . . within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant."  Ohio Rev. Code § 1336.09(A).[12]  It is undisputed that Plaintiffs' UFTA claims, which were first asserted on May 17, 2012, were brought more than four years after the transfer of Midwest.  Accordingly, Plaintiffs' claim is timely only if the one-year discovery rule applies.

The dispositive question here is whether the Midwest transfer "was or reasonably could have been discovered by" Plaintiffs before August 20, 2011.  Ohio Rev. Code § 1336.09(A).  In determining whether a party should have discovered wrongful conduct, the relevant inquiry under Ohio law is whether the facts known "would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry."  *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1300-01 (Ohio 1984).  If Plaintiffs

---

[12] The statute of limitations for a civil conspiracy claim is the same as the underlying cause of action.  *Cramer v. Fairfield Med. Ctr.*, 914 N.E.2d 447, 458 (Ohio App. 2009).  Accordingly, the same statute of limitations analysis applies to Plaintiffs' civil conspiracy claims.

"possessed knowledge sufficient to lead a reasonably prudent person to make inquiry and had such inquiry been made with reasonable care and diligence, it would have led to the discovery" of the Midwest transfer sometime before August 20, 2011, then the claim is untimely. *Id.* at 1301.

The Court first addresses a preliminary matter. Plaintiffs insist that the Court's two prior rulings that factual disputes precluded summary judgment on the statute of limitations issue prevents James Wilburn and Curtis from raising the issue in their current motions. (Docs. 147, 186). The Court's second ruling denied Plaintiffs' motion for partial summary judgment that the statute of limitations defense did not apply. (Doc. 186). James Wilburn filed his responsive memorandum to Plaintiffs' motion on June 20, 2013. (Doc. 160). On June 25, 2013, Plaintiffs filed a motion to extend the discovery deadline to September 15, 2013. (Doc. 166). The Court granted the extension in part and extended the discovery deadline to August 5, 2013 and the dispositive motions deadline to September 13, 2013. (Doc. 169). Plaintiffs then moved for default judgment against the business entity Defendants on July 8, 2013, supported by the affidavit of Diana Bradley. (Doc. 173-1). Diana Bradley was deposed that same day. (Doc. 203).

Courts have the inherent authority reconsider interlocutory orders when new evidence is available. *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009). Diana Bradley's affidavit was not available to James Wilburn or Curtis in opposing Plaintiffs' motion for summary judgment. (Doc. 160). The only facts presented to the Court on its prior rulings involved whether Plaintiffs and their counsel were diligent in investigating matters after filing their original complaint.

(Docs. 147, 186). However, Plaintiffs subsequently introduced new evidence that is highly relevant to the issue of whether Plaintiffs reasonably could have discovered the challenged transfer prior to filing their original complaint in October 2010. Notably, Plaintiffs filed this affidavit after requesting an extension to the discovery deadline and dispositive motion deadline. (Doc. 166). Accordingly, the Court concludes that it is proper to examine this new evidence.

The affidavit of Diana Bradley provides that on May 22, 2008 she received a letter from Fiserv, the IRA custodian, informing her that the GMD promissory notes where her money was invested been administratively dissolved. (Doc. 110-18 at 20; Doc. 173-1 at ¶ 38).[13] An account statement indicated that Bradley's Fiserv IRA account had a balance of $55.58 on September 30, 2008. (Doc. 110-18 at 21). Bradley asked Miller about the Fiserv letter, and Miller said he would have to look into the matter. (*Id.* at ¶ 40). About a week later, Miller informed Bradley that Colwell had been shot dead under mysterious circumstances. (*Id.* at ¶¶ 41-42). Bradley asserts she had never heard of Colwell, and Miller explained that Colwell had played an important role in managing their investment. (*Id.* at ¶ 41).[14] Miller explained that CI and GMRE could be forced to sell their real estate holdings. (*Id.* at ¶ 43).

Several weeks later, in June 2008, the Bradleys received written questionnaires from the Ohio Department of Commerce, Ohio Division of Securities requesting

---

[13] As previously noted, the Court only considers the portions of Diana Bradley's affidavit which are based on her personal knowledge.

[14] Plaintiffs submitted a number of account statements from Fiserv dated between 2005 and 2007, which prominently list David Colwell as the financial representative on her account. (Doc. 110-18 at 1, 3, 8, 11, 15, 18).

information about their investments in CI. (Doc. 173-1 at ¶ 46). The Bradleys signed the questionnaires in blank and permitted Miller to complete them. (*Id.* at ¶¶ 47-49, 51). Sometime thereafter, Mark Ballenger, an enforcement attorney at the Ohio Division of Securities, called Diana Bradley with follow-up questions about the questionnaires. (*Id.* at ¶ 50). Ballenger asked Bradley about Colwell, who was listed on the questionnaire as the person who sold her the investments. (*Id.*) Bradley denied that Colwell sold her the investments and told Ballenger that Miller had completed the questionnaires. (*Id.* at ¶¶ 41-42, 51).

Fifteen minutes later, Miller called Diana Bradley in an "angry" tone to ask what she told Ballenger. (Doc. 173-1 at ¶ 52). Ballenger called Bradley again later that day, explaining that the Ohio Division of Securities was beginning an investigation into CI and that she and her husband could be called to testify in court. (*Id.* at ¶ 53). Ballenger continued to speak with Diana Bradley about the investigation from approximately June to September 2008. (*Id.* at ¶ 55).

On <u>January 29, 2009</u>, Diana Bradley received a letter from <u>the Butler County Prosecutor</u> informing her of an ongoing criminal investigation into CI. (Doc. 173-1 at ¶ 65). The letter specifically <u>advised the Bradleys that their money was gone and that they should consult with an attorney</u>. (*Id.* at ¶¶ 70, 71). Diana Bradley spoke with Ballenger after receiving the letter from the Butler County Prosecutor about her mother's investment with Miller. (*Id.* at ¶ 74). At Ballenger's request, Diana Bradley sent Ballenger documents related to her mother's investment. (*Id.* at ¶¶ 74-76).

27

On December 30, 2008, the Ohio Department of Commerce filed a civil action against, *inter alia*, James D., Miller, CI, GMD, and GMRE.  (Doc. 108-8).  On March 10, 2009, Diana Bradley received a letter from the court-appointed receiver for James D. advising her to submit a claim.  (Doc. 203 at 93-94, 180).  Diana Bradley responded to the receiver with a letter dated March 14, 2009.  (Doc. 110-6 at 8-9).  Bradley's letter explained that the May 22, 2008 letter from Fiserv informed her that there was no money remaining in her IRA account.  (*Id.* at 9).  Bradley had called Fiserv shortly after she received the letter intending to close her account.  (*Id.*)  Bradley received another notice from Fiserv on January 10, 2009 charging her an account service fee.  (*Id.*)  On February 15, 2009, Bradley officially requested that Fiserv close her account and disburse any remaining funds.  (*Id.*)  Bradley received a check for $25.59 several weeks later.  (*Id.*)

Based on this new evidence introduced by Diana Bradley's affidavit, the Court concludes as a matter of law that the Bradleys "possessed knowledge sufficient to lead a reasonably prudent person to make inquiry and had such inquiry been made with reasonable care and diligence, it would have led to the discovery of the alleged" fraudulent transfer of Midwest prior to August 20, 2011.  *Hambleton*, 465 N.E.2d at 1301; Ohio Rev. Code § 1336.09(A).  Specifically, the Bradleys received notice from four independent parties between May 22, 2008 and March 10, 2009 that there were serious issues with their investments and the persons tasked with managing their funds.  Diana Bradley knew that her Fiserv account was worthless, that the Ohio Division of Securities was actively investigating the persons involved with her investment, that criminal charges were contemplated, and that a civil action was commenced.  Most notably, the Butler

28

County Prosecutor starkly warned Diana Bradley to consult with an attorney on January 29, 2009.  (Doc. 173-1 at ¶ 65).  During this time, Midwest was listed as a property owned by CI in the Real Estate Portfolio.  (Doc. 246, Ex. A).

Under the totality of the circumstances, the Bradleys had "knowledge of such facts as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry."  *Hambleton*, 465 N.E.2d at 1300-01.  Accordingly, Plaintiffs' fraudulent transfer and civil conspiracy claims are barred by the statute of limitations.  Ohio Rev. Code § 1336.09(A).

## V.  OCPA and OCPA Conspiracy

Plaintiffs move for summary judgment against all four Defendants on their OCPA and OCPA conspiracy claims, while James Wilburn and Curtis filed cross motions for summary judgment on these claims.  James D. and Miller did not file responsive memoranda.

### A.  Legal Standard

The OCPA, which is primarily a criminal statute, is modeled after the federal RICO statute.  These statutes were enacted to "enhance the government's ability to quell organized crime."  *State v. Schlosser*, 681 N.E.2d 911, 914 (Ohio 1997).  "The obvious intent of the General Assembly in enacting the RICO statutes was to reduce the influence and power of organized crime in the state."  *State v. Stevens*, 11 N.E.3d 252, 256 (Ohio 2014).  In addition to providing enhanced criminal sanctions, the OCPA authorizes civil actions for treble damages to persons who suffered injuries proximately caused by the OCPA violation.

### 1. *Substantive OCPA Violation*

The OCPA contains three distinct prohibitions:

(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

Ohio Rev. Code § 2923.32(A).[15]  Plaintiffs' amended complaint alleges that each Defendant violated and conspired to violate § 2923.32(A) without specifying a particular subsection.  (Doc. 46 at ¶¶ 220-23).[16]  However, Plaintiffs do cite each of the three subsections in their briefs and appear to argue violations of each provision.  Accordingly, the Court will construe Plaintiffs' amended complaint to assert a violations of each of the three provisions of § 2923.32(A).  *See Sheets v. Carmel Farms*, No. 96APE09-1224, 1997 Ohio App. LEXIS 2442, at *13-14 (Ohio App. June 5, 1997) (noting that the plaintiffs' OCPA claims "are not models of clarity," but construing them to assert violations of each subsection).

---

[15] Ohio case law focuses almost exclusively on § 2923.32(A)(1).

[16] In contrast, Plaintiffs alleged violations of the four RICO subsections in separate claims. (Doc. 46 at ¶¶ 212-18).

To establish a violation of § 2923.32(A)(1), Plaintiffs must prove "(1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and (3) that the defendant has participated in the affairs of an enterprise." *Hall v. CFIC Home Mtg.*, 888 N.E.2d 469, 477 (Ohio App. 2008). A violation of § 2923.32(A)(2), sometimes referred to as an acquisition claim, requires proof : "(1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and (3) that the defendant . . . has acquired or maintained an interest in or control of an enterprise" or real property. *Id.* Finally, an investment claim under § 2923.32(A)(3) requires proof: (1) that the defendant knowingly received proceeds derived from a pattern of corrupt activity, (2) that the defendant used or invested those proceeds (3) to acquire an interest in real property or in the establishment of an enterprise. *Sheets*, 1997 Ohio App. LEXIS 2442, at *13-14.[17]

There are two major differences between violations of § 2923.32(A)(1) and (A)(2) on the one hand, and § 2923.32(A)(3) on the other. First, § 2923.32(A)(1) and (A)(2) require proof that the defendant personally committed two or more predicate acts that constitute a pattern of corrupt activity. *State v. Feliciano*, 685 N.E.2d 1307, 1311 (Ohio

[17] "Ohio's RICO statute differs from its federal counterpart in that an acquisition or investment claim under R.C. 2923.32(A)(2) or (3), respectively, may be made by alleging acquisition of, or investment in either an enterprise or real property.  In contrast, a federal acquisition or investment claim under sections 1962(b) and (a), respectively, must allege acquisition of, or investment in[,] an enterprise." *Sheets*, 1997 Ohio App. LEXIS 2442, at *13 n.3.  Plaintiffs focus exclusively on Defendants' alleged acquisition of or investment in real property.

App. 1996). Although a violation of § 2923.32(A)(3) requires proof of the existence of a pattern of corrupt activity, it "does not require that the defendant have committed the acts that are the basis for the 'pattern of corrupt activity.'" *Id.* at 1314. Second, § 2923.32(A)(1) and (A)(2) are strict liability offenses, while § 2923.32(A)(3) requires proof that the defendant acted "knowingly." *State v. Schlosser*, 681 N.E.2d 911, 913-14 & n.1 (Ohio 1997). Accordingly, "no culpable mental state is required" to establish that a defendant engaged in a pattern of corrupt activity for purposes of § 2923.32(A)(1) and (A)(2). *Id.* at 915-16. Rather, "if a defendant has engaged in two or more acts constituting a predicate offense, he or she is engaging in a pattern of corrupt activity and may be found guilty of a RICO violation" if the defendant also either participated in the affairs of an enterprise, § 2923.32(A)(1), or acquired or maintained an interest in an enterprise or real property, § 2923.32(A)(2). *Id.* at 915.[18] Conversely, § 2923.32(A)(3) "refers to 'knowingly' receiving and investing proceeds from a pattern of corrupt activity, presumably to protect innocent investors, banks, etc." *Id.* at 913 n.1.

The Supreme Court of Ohio summarized the multiple overlapping elements of a § 2923.32(A)(1) violation as follows:

> A RICO offense is dependent upon a defendant committing two or more predicate offenses listed in R.C. 2923.31(I). However, a RICO offense also requires a defendant to be "employed by, or associated with" an "enterprise" and to "conduct or participate in" an "enterprise through a pattern of corrupt activity." R.C. 2923.32(A)(1). Such pattern must include both a relationship and continuous activity, as well as proof of the existence of an enterprise. Thus, the conduct required to commit a RICO violation is independent of the conduct required to commit the underlying predicate

---

[18] This does not remove the necessity to prove the *mens rea* for the underlying predicate offenses that make up the pattern of corrupt activity. *Schlosser*, 681 N.E.2d at 915.

offenses. The intent of RICO is to criminalize the pattern of criminal activity, not the underlying predicate acts.

*State v. Miranda*, 5 N.E.3d 603, 606-07 (Ohio 2014) (internal citations omitted).

Many of the terms used in the OCPA are statutorily defined. "Corrupt activity" means "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" any of a long list of enumerated state and federal criminal statutes. § 2923.31(I). A "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." § 2923.31(E).[19] "The commission of two incidents of corrupt activity alone is insufficient to demonstrate a pattern of corrupt activity." *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 708 (Ohio App. 2009). Instead, "a pattern of corrupt activity under the OCPA requires that predicate crimes be related and pose a threat of continued criminal activity." *Id.*

"Enterprise" is defined as including "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." § 2923.31(C). The Supreme Court of Ohio has remarked that "[t]he definition of 'enterprise' is remarkably open-ended" and observed that the statute "does not indicate

---

[19] As discussed *infra*, not every pattern of corrupt activity is sufficient to support a civil OCPA action.

how the existence of an enterprise is to be proved." *Beverly*, 2015-Ohio-219, at ¶¶ 8-9. Several recent cases have sought to clarify the definition of an enterprise and develop standards to prove its existence.

To prove that a defendant was "associated" with an enterprise, the prosecution or a civil plaintiff must "prove that each defendant was voluntarily connected to that pattern [of corrupt activity] and performed at least two acts in furtherance of it." *Schlosser*, 681 N.E.2d at 915. To "conduct" the affairs of the enterprise means "to direct." *State v. Beverly*, 2015-Ohio-219, at ¶ 19. Alternatively, a defendant may "participate" in the affairs of the enterprise. In the context of the OCPA, "participate" means "to take part in and is not limited to those who have directed the pattern of corrupt activity. It encompasses those who have performed activities necessary or helpful to the operation of the enterprise whether directly or indirectly without an element of control." *Id.*

In *State v. Griffin*, 24 N.E.3d 1147 (Ohio 2014), the Supreme Court of Ohio indicated that "the concepts of 'common purpose' and 'acting in concert' are included in the concepts of 'associating with an enterprise' and 'conducting or participating in the affairs of that enterprise.'" *Id.* at 1151. In *Beverly*, the Supreme Court of Ohio formally adopted the federal RICO definition of an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Beverly*, 2015-Ohio-219, at ¶ 9 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

For an OCPA conspiracy claim, "the plaintiff is not required to prove that each defendant committed two or more predicate acts." *In re Nat'l Century Fin. Enterprises,*

*Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1157 (S.D. Ohio 2009).  However, Plaintiffs can only meet their "burden by presenting evidence that the defendant agreed that others would commit the acts that would establish the 'pattern of corrupt activity.'"  *Feliciano*, 685 N.E.2d at 1316.  This requires proof that a defendant "knowingly cooperated in a common plan" to engage in a pattern of corrupt activity.  *In re Nat'l Century Fin. Enterprises*, 604 F. Supp. 2d at 1159.[20]

### 2. Civil cause of action

In addition to establishing a violation or conspiracy to violate any or all of the subsections of § 2923.32(A), a plaintiff in a civil OCPA action must prove he or she was injured, directly or indirectly, by the OCPA violation and the injuries were proximately caused by that violation.

First, the plaintiff must prove that he or she is a "person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section."  Ohio Rev. Code § 2923.34(E).  Ohio courts apply "traditional notions of proximate cause" to civil OCPA actions.  *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *5, *8 (Ohio App. Mar. 21, 2013).  Although the OCPA is "broader than the comparable federal RICO requirement" in that it authorizes

---

[20] Plaintiffs erroneously argue that an OCPA conspiracy may also be established through strict liability.  In doing so, Plaintiffs appear to conflate the distinct concept of a strict liability offense with a conspiracy.  In *State v. Schlosser*, 681 N.E.2d 911 (Ohio 1997), the Supreme Court of Ohio held that § 2923.32(A)(1) and (A)(2), but not § 2923.32(A)(3), are strict liability criminal offenses such that "no culpable mental state is required."  *Id.* at 916.  Plaintiffs rely heavily on *State v. Siferd*, 783 N.E.2d 591 (Ohio App. 2002), but that case involved a defendant convicted of a substantive violation of § 2923.32(A)(1), not a conspiracy to engage in a pattern of corrupt activity.  Accordingly, *Siferd* provides no guidance for establishing an OCPA conspiracy in a civil action.

civil actions to recover for indirect injuries, it is "clear a plaintiff bringing a claim under

[OCPA] must prove its damages were proximately caused by the defendant's" conduct in

violation of § 2923.32(A).  *CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, No.

2010CA00303, 2012 WL 750972, at \*9-10 (Ohio App. 2012).  Accordingly, "the

language in § 2923.34(E) that any person directly or indirectly injured can state a private

cause of action informs the analysis of whether, but does not relieve the burden to prove

that, the illegal conduct proximately caused the plaintiff's injury."  *W. & S. Life Ins. Co. v.

JPMorgan Chase Bank, N.A.*, __ F. Supp. 3d __, No. 1:11-cv-495, 2014 WL 5308422, at

\*25 (S.D. Ohio Oct. 16, 2014).

 Proximate cause "requires a showing of connection between the violations and the

claimed injuries."  *Lesick v. Manning*, No. 91-C-70, 1992 WL 380284, at \*3 (Ohio App.

Dec. 17, 1992).  The proximate cause inquiry is tied to the particular violation of

§ 2923.32(A).  A civil action premised on a violation of § 2923.32(A)(1) requires proof

that the defendant's pattern of corrupt activity proximately caused the plaintiff's injury.

*Herakovic v. Catholic Diocese of Cleveland*, No. 85467, 2005 WL 3007145, at \*5 (Ohio

App. Nov. 10, 2005).  If a defendant acquired an interest in real property through a

pattern of corrupt activity in violation of § 2923.32(A)(2), the plaintiff must offer proof

that its injuries were proximately caused by the defendant's acquisition of that property

interest.  *Sheets*, 1997 Ohio App. LEXIS 2442, at \*18.  Finally, if a violation of

§ 2923.32(A)(3) is demonstrated based on evidence that a defendant knowingly received

proceeds derived from a pattern of corrupt activity and used or invested those proceeds to

acquire an interest in real property, then the plaintiff must establish injuries proximately

caused by the usage or investment of those proceeds.  *Id.*

Second, the pattern of corrupt activity that forms the basis of a civil claim "shall

include at least one incident other than a violation of" state and federal criminal statutes

prohibiting mail or wire fraud, securities fraud, or interstate transportation of stolen

goods.  Ohio Rev. Code § 2923.34(E).  Accordingly, Plaintiffs must demonstrate that

each defendant engaged in a "pattern of corrupt activity that includes at least one

predicate act that is not a form of securities fraud, mail or wire fraud, or the interstate

transportation of stolen property or securities."  *Baker v. Pfeifer*, 940 F. Supp. 1168, 1181

(S.D. Ohio 1996).

### 3.  *Predicate Acts*

Plaintiffs allege that the Defendants' pattern of corrupt activity included money

laundering, § 1315.55(A), and tampering with records, § 2913.42(A).

### a.  *Money Laundering*

Plaintiffs rely on two subsections of the money laundering statute, which provide:

(1) No person shall conduct or attempt to conduct a transaction knowing
that the property involved in the transaction is the proceeds of some form of
unlawful activity with the purpose of committing or furthering the
commission of corrupt activity.
. . . .
(3) No person shall conduct or attempt to conduct a transaction with the
purpose to promote, manage, establish, carry on, or facilitate the promotion,
management, establishment, or carrying on of corrupt activity.

§ 1315.55(A).  The term "transaction" includes "a purchase, sale, trade, loan, pledge,

investment, gift, transfer, transmission, delivery, deposit, withdrawal, payment, transfer

between accounts, exchange of currency, extension of credit, purchase or sale of a payment instrument, use of a safe deposit box, or any other acquisition or disposition of property." § 1315.51(L). "Corrupt activity" has the same meaning as in the OCPA. § 1315.51(B).

In *State v. Pugh*, No. 24905, 2010 WL 2393603 (Ohio App. June 16, 2010), an Ohio appellate court reversed a conviction under § 1315.33(A)(3) because "the State did not present any evidence of an independent corrupt activity to support Pugh's conviction for money laundering." *Id.* at 5. The court stressed that "[t]he act of transacting money alone does not amount to money laundering. Instead, one must transact with the 'purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.'" *Id.* at 4. The prosecution's case was fatally flawed because there was no evidence to "connect the transfer of the $25,000 with any particular wrongdoing on Pugh's part that would constitute a corrupt activity." *Id.* A violation of § 1315.55(A)(1) "requires that an individual conduct a transaction knowing that the property involved are proceeds from some other unlawful activity." *State v. Clayton*, No. 22937, 2009 WL 5247521, at *10 (Ohio App. Dec. 30, 2009).

### b.    *Tampering with records*

The Ohio tampering with records statute provides:

(A) No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:
    (1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record;
    (2) Utter any writing or record, knowing it to have been tampered with as provided in division (A)(1) of this section.

§ 2913.42(A).  "Defraud" means to "knowingly obtain, by deception, some benefit for

oneself or another, or to knowingly cause, by deception, some detriment to another."

§ 2913.01(B).  The dispositive question is whether the defendant, "with a purpose to

commit fraud, falsified any writing or record."  *State v. Brunning*, 983 N.E.2d 316, 323

(Ohio 2012).

 A violation of § 2913.42(A)(1) requires proof that the defendant falsified or

destroyed the particular record at issue, while under § 2913.42(A)(2) the defendant need

only utter the record.  *State v. Burns*, No. 95465, 2011 Ohio App. LEXIS 3572, at *16-18

(Ohio App. Aug. 19, 2011).  In *Burns*, a conviction under § 2913.42(A)(1) was reversed

because there was no evidence that the defendant personally falsified the documents at

issue.  *Id.* at 16.  The evidence established that a co-defendant "created the invoices and

that Burns would deliver them."  *Id.* at 18.  This was insufficient to support the

conviction because "no evidence established that Burns tampered with the invoices

himself."  *Id.*[21]

 **B. James D. and Miller**

 James D. and Miller failed to respond to Plaintiffs' motion for summary judgment.

Accordingly, the Court will consider Plaintiffs' properly supported facts as undisputed for

purposes of their claims against James D. and Miller.  Fed. R. Civ. P. 56(e)(2).  The facts

involving these two Defendants are further buttressed by the factual admissions made in

their plea agreements, as well as the adverse inferences entered by the Court after the

---

[21] The court observed that the defendant likely violated § 2913.42(A)(2), but he was not charged
with violating that particular provision.  *Id.*

39

close of dispositive motion briefing.  (Doc. 250).  <u>Together, this undisputed evidence</u>

<u>establishes that James D. engaged in a pattern of corrupt activity that proximately caused</u>

<u>Plaintiffs' injuries.  The evidence also demonstrates that Miller conspired with James D.</u>

<u>to engage in a pattern of corrupt activity.</u>  Accordingly, Plaintiffs have shown that there

are entitled to judgment as a matter of law on their OCPA and OCPA conspiracy claims

against James D., and their OCPA conspiracy claim against Miller.

In addition to James D.'s wire fraud conviction, Plaintiffs establish that James D.

engaged in dozens of acts of money laundering in violation of §1315.55(A)(1) or (A)(3).

Between October 2005 and January 2006, James D. received nine checks from GMRE,

three checks for $1,430.50 and six for $2,000.  (Doc. 216-3).  James D. knew that these

funds were proceeds from the Ponzi scheme, and in utilizing the proceeds, James D.

intended to further the commission of the investment scheme.  §1315.55(A)(1).

James D. also personally wrote or authorized others to write checks from the CI

and GMRE bank accounts to salesmen as commission for attracting new investors.

Miller received at least three commission checks from CI between May 10, 2005 and

January 1, 2006, in the amounts of $668.21, $2,864.90, and $110.42.  (Doc. 163 at 112-

13; Doc. 216-4).  Hubert Rials, another salesman for CI, received twenty-two checks

from CI.  (Doc. 163 at 58-59; Doc. 216-5).  James D. testified that Colwell used James

D.'s signature stamp to issue the checks, which James D. had authorized Colwell to use.

(Doc. 163 at 58-59, 113-14).  The checks are dated between May 19, 2005 and October

13, 2006 and range in amount from $600 to $7,889. (Doc. 216-5).[22] Chatsworth Jacobs was also an employee of GMRE. (Doc. 163 at 114-15). James D. authorized eight payments from CI to Jacobs. (Doc. 216-6). The checks were dated between April 12, 2005 and January 29, 2008 for amounts ranging from $106.36 to $2,472.30. (*Id.*) Between April 5, 2005 and May 10, 2006, James D. authorized CI to make six payments to Colwell to repay a loan Colwell had made to GMRE. (Doc. 163 at 118-20; Doc. 216-7; Doc. 250 at 3-4).

The Court also entered a number of adverse inferences against James D. that establish predicate acts of money laundering. James D. wrote thirty-one checks from the bank accounts of GMRE and GMD to pay for company expenses necessary to maintain operations, such as utilities and account maintenance fees. (Doc. 250 at 4-5). A significant number of these checks were made payable to cash. (Doc. 187-5 at 9-11). James D. also wrote six checks to payoff investors. (Doc. 250 at 7-8).[23]

The undisputed evidence establishes that James D. committed money laundering in violation of §1315.55(A)(1) or (A)(3) through each of theses checks. James D. was intimately involved in the operation of CI, GMRE, and GMD. He had full knowledge

---

[22] The twenty-two checks are all made payable to the Bank of Kentucky, a detail that Plaintiffs neither identify for the Court nor attempt to explain. (Doc. 216-5). Notwithstanding this unexplained discrepancy, the memo line indicates the checks are for "Hugh Rials" and several also include the word "commission," "interest," or "renewals." (*Id.*)

[23] In stark contrast to the independent evidence that supported the adverse inferences entered against James D., such as copies of the relevant checks, the independent evidence for the adverse inferences against Miller was his statement of facts from the plea agreement and Diana Bradley's affidavit. (Doc. 250 at 14-28). The questions Miller refused to answer on Fifth Amendment grounds consisted of Plaintiffs' counsel reading each sentence from his statement of facts and select sentences from Diana Bradley's affidavit, and then asking Miller to confirm if that sentence was true. (Doc. 191 at 14-33).

that the funds in the bank accounts were derived from investors and he acted with the intent to further the commission of the Ponzi scheme by ensuring that the salesmen continued to solicit new investors to roll over their IRA accounts into promissory notes or debt instruments with CI or GMD.  (Doc. 208, Ex. 9; Doc. 250 at 3-5).  Additionally, this amounts to a pattern of corrupt activity because the predicate acts of money laundering and wire fraud were "related and pose[d] a threat of continued criminal activity." *Morrow*, 915 N.E.2d at 708.  The undisputed evidence also establishes that James D. was "employed by, or associated with" an enterprise and that he conducted or participated in that enterprise through a pattern of corrupt activity.  *Miranda*, 5 N.E.3d at 606-07.  James D. and Colwell associated together for a common purpose of engaging in a course a conduct, namely, defrauding investors and pilfering the money for personal use.  *Beverly*, 2015-Ohio-219, at ¶ 9.

By reason of his guilty plea to the charge of conspiracy to commit mail fraud and the conduct admitted in his statement of facts, Miller conspired to violate the OCPA.[24] However, Plaintiffs' failure to show that Miller personally engaged in a pattern of corrupt activity is fatal to their substantive OCPA claim – although for an OCPA conspiracy claim

---

[24] The Court notes that Plaintiffs' devote only seven sentences to their contention that they are entitled to judgment as a matter of law on their OCPA claims against Miller, and these sentences are entirely devoid of any attempt to make a developed argument.  (Doc. 208 at 49-51).  Three sentences merely refer to Miller's criminal conviction or his statement of facts.  The remaining four sentences state in conclusory fashion that Plaintiffs have established the elements of their claims.  The Court declines to make the arguments that Plaintiffs simply failed to make. *Guarino*, 980 F.2d at 410.  This principle typically restrains courts from adopting the "partisan perspective of an advocate for the non-moving party." *Id.*  While it is unusual for the non-moving party to file a response in opposition, even in such circumstances, the Court must restrain from making arguments for the movant.

"the plaintiff is not required to prove that each defendant committed two or more predicate acts." *In re Nat'l Century Fin. Enterprises*, 604 F. Supp. 2d at 1157.[25]

Miller's factual admissions in his statement of facts are sufficient to demonstrate that Miller "agreed that others would commit the acts that would establish the 'pattern of corrupt activity,'" *Feliciano*, 685 N.E.2d at 1316, and that Miller "knowingly cooperated in a common plan" to engage in a pattern of corrupt activity with James D. and Colwell. *In re Nat'l Century Fin. Enterprises*, 604 F. Supp. 2d at 1159. Accordingly, Miller and James D. conspired to violate the OCPA.

Finally, it is undisputed that Plaintiffs' injuries were proximately caused by the pattern of corrupt activity perpetrated by James D. and Colwell, which Miller conspired to further. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their OCPA and OCPA conspiracy claims against James D., and upon their OCPA conspiracy claim against Miller. Plaintiffs failed to show they are entitled to judgment as a matter of law on their substantive OCPA claim against Miller.

## C. James Wilburn and Curtis

Plaintiffs were unquestionably defrauded by the false representations and material omissions of James D., Miller, and Colwell as they solicited investments in promissory notes offered by CI and GMD, purportedly backed by property owned by GMRE. By the

---

[25] Plaintiffs' complete argument that Miller committed predicate acts states: "In his Statement of Facts, Miller recited dozens of predicate acts related to this criminal enterprise. (Doc. 192, Appx. A). All these facts, and the many more contained in Miller's Statement of facts, are predicate acts for the purposes of Bradleys' individual RICO claim against him. Ohio Rev. Code § 2923.31(I)." (Doc. 208 at 49-50). Plaintiffs made no attempt to apply any of these facts admitted in his plea agreement, which Miller is estopped from denying, to the elements of any of the dozens of criminal statutes listed in § 2923.31(I).

time the Ponzi scheme and the real estate market collapsed in close succession, Plaintiffs were among the 90 investors who lost upwards of $9.2 million. However, after extensive discovery and years of litigation, Plaintiffs fail to produce any evidence that James Wilburn or Curtis played any role in that unfortunate chain of events.

### 1. *James Wilburn pattern of corrupt activity*

Plaintiffs contend that James Wilburn engaged in over twenty-five predicate acts of money laundering. Plaintiffs contend that the following acts related to Midwest were in violation of the money laundering statute: executing the Quit Claim Deed with James D.; executing the Mutual Release of Land Contract and releasing $120,000 in loans to James D.; arranging for James D. to receive a $10,000 commission on the sale of Midwest; agreeing to sell Midwest to Curtis; executing a mortgage with Curtis; receiving a check for the Midwest sale; and depositing that check in his bank account. Plaintiffs also challenge a number of money transfer made by James Wilburn personally or by his wife Betty with James Wilburn's participation. Although Plaintiffs succeed in showing that many of these acts were "transactions" within the broad statutory definition of the term, Plaintiffs fail to offer evidence suggesting that James Wilburn made any of these transactions with the purpose to commit, further, or promote corrupt activity.

Plaintiffs allege money laundering in violation of § 1315.55(A)(1) and (A)(3). A violation of § 1315.55(A)(1) requires that proof that the defendant conducted the transaction "knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of

corrupt activity." The only acts that could arguably involve property that was the proceeds of unlawful activity are the transfers of Midwest.

James Wilburn divested James D. of any interest in Midwest through the Mutual Release of Land Contract and the Quit Claim Deed. (Doc. 198, Ex. G; Doc. 208-16). However, James Wilburn retained title under the Land Contract until James D. paid the purchase price in full. (Doc. 198, Ex. A at ¶ 16). James D. defaulted on those payments and title never transferred. This prompted James Wilburn to exercise his creditor's rights under the terms of the Land Contract and Ohio law. Plaintiffs contend that taking possession of Midwest was a separate act of money laundering.

The Court need not decide whether these acts are a "transaction" under § 1315.51(L) because Plaintiffs cannot satisfy the other elements of § 1315.55(A)(1). There is no evidence that Midwest was the "proceeds of some form of unlawful activity." Plaintiffs do not challenge the initial Land Contract. Although James D. may have held out Midwest as a property owned by GMRE, there is nothing to support the legal conclusion that Midwest became the "proceeds" of the investment scheme. The evidence only demonstrates that James D. neglected Midwest, failed to make his required monthly payments, and then James Wilburn exercised his creditor's rights after James D. defaulted. James Wilburn cannot reasonably be said to have acted "with the purpose of committing or furthering unlawful activity" by divesting James D. of any interest he had in Midwest. Instead, James Wilburn clearly acted inconsistent with any intent to further a corrupt activity. The subsequent sale of Midwest to Curtis also has no connection to committing or furthering corrupt activity.

The remaining acts could only constitute money laundering under § 1315.55(A)(3) because there is no evidence that the property involved were the proceeds of unlawful activity.  Yet "[t]he act of transacting money alone does not amount to money laundering. Instead, one must transact with the 'purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.'" *Pugh*, 2010 WL 2393603, at *4.  Here, Plaintiffs present no evidence that James Wilburn entered any of these transactions "with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity."  §1315.55(A)(3).

Plaintiffs allege that James Wilburn made payments to two investors in the Ponzi scheme, F.D. Jaffe and Robinson.  On February 22, 2006, an individual, whom Plaintiffs identify in their briefs only by the name Jaffe, wrote a $45,000 check to GMD.  (Doc. 163 at 134; Doc. 216, Ex. 3).[26]  Plaintiffs describe Jaffe as investor, but provide no factual support for this assertion.  On November 8, 2006, Betty withdrew $45,000 from her First Financial Account.  (Doc. 216-1 at 24).  Written on the withdrawal slip are the words "loaned Jamie - $55,000; $45,000 Wired to New Y Jaffe; $10,000 to pay off IRS bill." (*Id.*)  Betty had no memory of the transfer, but testified that Jaffe sold jewelry and that paying for diamonds was the only conceivable reason she would transfer that much money to Jaffe.  (Doc. 249-6 at 135-38).  Plaintiffs alleged that James Wilburn participated in that transfer, but they cite no record evidence in support.

---

[26] The cited check clearly identifies the payor as F.D. Jaffe & Co, Inc.  (Doc. 216, Ex. 3). Plaintiffs make no mention of this in their briefs.

On June 13, 2007, James Wilburn paid $20,000 to Robinson.  (Doc. 183-5 at 3). The record is undisputed that Robinson loaned $20,000 to James D. on January 23, 2007 as the two negotiated for the purchase of Marlou.  (Doc. 197 at 13; Doc. 224 Ex. B). Robinson wrote on the memo line of the check that the money was for Marlou.  (Doc. 224 Ex. B).  It is undisputed that Robinson thought that James D. would purchase Marlou and that James D. would repay the loan at the closing.  (Doc. 197 at 16-17).  There is no evidence that Robinson had any involvement in CI, GMD, or GMRE.  The Marlou transaction was wholly unrelated to the business entities or the Ponzi scheme.  Instead, it is clear that James D. used the Marlou negotiations as a ruse to obtain a loan from Robinson before substituting Curtis as the purchaser minutes before the closing.  James D. may have defrauded Robinson into making the loan, but that was wholly separate and apart from his investment scheme.

Plaintiffs allege that the ten checks, cashier's checks, and transfer from James Wilburn and Betty constituted money laundering.  (Doc. 216, Ex. 23 at 13, 22, 23, 26, 35, 37, 40, 41, 44).[27]  It is undisputed that Betty purchased the four cashier's checks between September 6, 2007 and October 15, 2007 from her Fifth Third account.  (*Id.* at 35, 37, 40, 41).  It is also undisputed that James Wilburn was not authorized to make transactions from this account.  (Doc. 200 at 112).

---

[27] Plaintiffs also cite a $31,000 Fifth Third cashier's check made payable to GMD purchased by "James Powell" on December 21, 2006.  (Doc. 216, Ex. 23 at 31).  James Wilburn testified that he knew nothing about the check, that he never signs his name as simply "James Powell" without using his middle name or initial, that the Fifth Third account was in his wife's name only, and that her account was not opened until July 2007.  (Doc. 200 at 112-13, 117).  Additionally, Betty Powell testified that she knew nothing about that cashier's check and had not heard of GMD at the time the check was issued.  (Doc. 249-6 at 90).

With respect to the checks actually written by James Wilburn, Plaintiffs cannot show that James Wilburn wrote them with the intent to facilitate or perpetuate James D.'s Ponzi scheme.  The evidence establishes only that James Wilburn lent money to his cash-strapped son.  The fact that James D. was operating a fraudulent investment scheme is not sufficient to establish that his father was both aware of its existence and intended to keep it in operation.  The Court need not dwell on whether the remaining acts could qualify as transactions because they are wholly unrelated to the Ponzi scheme.  While Plaintiffs survived motions to dismiss based on allegations alone, those same allegations are <u>not</u> sufficient to survive summary judgment.  Plaintiffs were required to offer <u>evidence</u> that James Wilburn engaged in these transactions "with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity."  §1315.55(A)(3).  Even after construing all inferences in their favor, there is simply no support for finding James Wilburn engaged in these transactions "with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity." *Id.*

### 2. *Curtis pattern of corrupt activity*

Plaintiffs contend that Curtis committed tampering by signing loan applications containing inaccurate financial statements and committed money laundering by writing two checks to his cousin James D.

### a. *Tampering*

Plaintiffs identify eighteen inaccurate statements across four documents and contend that each statement constituted a separate act of tampering.  Curtis concedes that

there were several errors on the loan applications and the settlement statement he signed, but he adamantly contends that this information was taken without his knowledge from a prior loan application submitted to the same lender on November 13, 2006, that the information was entirely accurate at that time, and that he was unaware of the inaccuracies when he hurriedly signed the documents.  (Doc. 218 at ¶ 10).

As an initial matter, these allegations pertain to four separate documents. However, Plaintiffs allege that there were eighteen acts of tampering.  This contention has no support in either the plain language of the statute nor Ohio case law.  The tampering statute provides that no person, with the purpose to defraud, shall either "falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record" or "utter any writing or record, knowing it to have been tampered with."  Ohio Rev. Code § 2913.42(A).  Subsections (A)(1) clearly intends to prohibit acts such as the falsification, destruction, or concealing  of any "writing" or "record" as a whole, and does not refer to the particular statements contained in the writing.  Moreover, subsection (A)(2) prohibits uttering a tampered writing or record, again referring to the whole and not the parts.  One can only utter a writing or record as a complete document.

 If there were any doubt remaining, case law solidifies the answer.  In *State v. Trammell*, 3 N.E.3d 260 (Ohio App. 2013), the defendant was charged with 25 counts of tampering based on signing five falsified contracts and submitting 20 falsified invoices. *Trammell*, 3 N.E.3d at 271.  Even though each contract and invoice contained multiple false statements, the number of tampering charges hinged on the number of contracts and invoices.  *Id.*  Here, Plaintiffs allege that Curtis tampered with four records: the Marlou

loan application, the Midwest HUD statement, the Midwest loan application, and the 8000 Hamilton loan application.  Accordingly, Plaintiffs allege Curtis committed four predicate acts of tampering with records.[28]

Plaintiffs must prove that Curtis acted "with a purpose to commit fraud." *Brunning*, 983 N.E.2d at 323.  Construing the facts in the light most favorable to Plaintiffs, the evidence indicates that Curtis acted negligently by signing the loan applications without reviewing their accuracy.  This is insufficient as a matter of law to constitute tampering.  Tampering requires one to act "with the purpose to defraud." § 2913.42(A).  "Defraud" means to "knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." § 2913.01(B).  Plaintiffs offer no evidence that Curtis satisfied this *mens rea*.  Nor is there evidence that Curtis would not have received the loans but for the inaccurate statements.

Curtis provided uncontradicted testimony that Barbara Hoffman completed the information on the loan applications, which Curtis then signed apparently without reviewing.  (Doc. 195 at 55-56, 64, 76, 80).  Hoffman completed at least four loan applications for Curtis, including loans for the purchase of real estate that somehow were not made part of this action.  (*Id.* at 84, 153).  Curtis' purchase of Marlou and 8000 Hamilton has no connection to the Ponzi scheme that caused Plaintiffs' injuries. Plaintiffs

---

[28] Even if the allegations could amount to more than one tampering offense under that statute, the OCPA provides that each incident of corrupt activity may not be "so closely related to each other and connected in time and place that they constitute a single event."  Ohio Rev. Code § 2923.31(E).

offer no evidence about Marlou after its purchase on March 2, 2007. There is no allegation or evidence that Marlou was ever presented as a property purchased with investor monies or was in any way associated with CI, GMRE, or GMD. Instead, the undisputed evidence demonstrates that James D. negotiated the purchase of Marlou with Robinson to obtain easy money for himself, then substituted Curtis as the purchaser minutes before the closing occurred. Curtis and his wife purchased 8000 Hamilton from persons who have no involvement in this action. (Doc. 195 at 49, 103). These two real estate purchases and the associated loan applications were made for Curtis and Curtis alone. They were not listed among the 40 properties listed in the Real Estate Portfolio. (Doc. 246, Ex. A). There is no evidence that anyone ever claimed they were owned by CI or GMRE and no connection to the Ponzi scheme.

### b.  *Money laundering*

Plaintiffs argue that Curtis committed money laundering by writing two checks to James D. and by taking possession of Midwest after he purchased it from James Wilburn. It is undisputed that on June 14, 2007 Curtis paid James D. $10,000 as a commission for acting as the realtor on the sale of Midwest. (Doc. 198, Ex. N). It is also undisputed that Curtis paid James D. $12,000 on September 12, 2007. (*Id.*, Ex. P). The two checks could only amount to money laundering under § 1315.55(A)(3) because there were not proceeds of unlawful activity. "The act of transacting money alone does not amount to money laundering." *Pugh*, 2010 WL 2393603, at *4. Instead, Plaintiffs must offer proof that Curtis wrote the checks to James D. "with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of

corrupt activity."  § 1315.55(A)(3).  Plaintiffs have failed to offer any evidence that

Curtis paid this money to James D. with the purpose to promote the Ponzi scheme.

Curtis provided uncontradicted explanations for each check.  James D. approached

Curtis about the $10,000 commission; it was not something that Curtis initiated. (Doc. 19

at 65-68).  Curtis had only learned about Midwest because of James D., so he consented

to paying the commission.  (*Id.*)  After that, Curtis did not speak with James D. again

until early September 2007, when James D. approached Curtis in a very desperate

manner talking about suicide.  (*Id.* at 69-72).  James D. said that he needed money to pay

the mortgage on his own house and adamantly asserted that he held equity in Midwest.

(*Id.*)  Curtis was particularly sensitive to suicide because years earlier another cousin had

committed suicide and Curtis watched the children grow up without a father.  (*Id.* at 70).

Eventually Curtis borrowed $12,000 from another family member and wrote a check on

September 12, 2007, which Curtis hoped would prevent his cousin James D. from also

committing suicide.  (*Id.*; Doc. 198, Ex. P).  It was not until Colwell committed suicide in

March 2008 that Curtis learned that James D.'s properties were in foreclosure and that

James D. had taken money from other investors.  (Doc. 195 at 174, 181).

Plaintiffs offer no evidence suggesting that Curtis was aware of the Ponzi scheme

during this timeframe.  Curtis testified that he had no knowledge of other investors until

after Colwell died in March 2008.  (Doc. 195 at 174, 181).  Plaintiffs attempt to impute

knowledge of the Ponzi scheme based primarily on hindsight.  It is undisputed that Curtis

knew that James D. had squandered his $50,000 buy-in to C&J Properties, that James D.

wrote bad checks to Robinson, and that James D. had defaulted on his Midwest payments

to his father James Wilburn.  (Doc. 195 at 20-22, 25-26).  However, knowledge that James D. had bounced a check or defaulted on a mortgage provides no basis to suggest that Curtis was aware that James D. was operating a Ponzi scheme that defrauded over 90 investors out of $9.2 million.  (Doc. 208, Ex. 9 at 8).  Further, Plaintiffs offer no evidence of why Curtis would want to assist that scheme.  Curtis never received commission checks nor any monetary benefit from CI.  Accordingly, Plaintiffs cannot show that Curtis wrote these two isolated checks "with the purpose to promote . . . corrupt activity."  Ohio Rev. Code § 1315.55(A)(3).  There is no evidence that connects Curtis, much less these two particular transactions, with the Ponzi scheme.

### 3.  Association and Participation

Even if Plaintiffs could establish that James Wilburn and Curtis committed sufficient predicate acts to constitute a pattern of corrupt activity, Plaintiffs present no evidence suggesting that either was "employed by, or associated with" the Ponzi scheme enterprise or "conducted or participated in" that enterprise through the pattern of corrupt activity. *Miranda*, 5 N.E.3d at 606.  The evidence demonstrates that James Wilburn and Curtis had no contemporaneous knowledge of the real estate securities Ponzi scheme operated by James D. and Colwell with the assistance of persons such as Miller.  To overcome the motions for summary judgment, Plaintiffs must offer evidence that James Wilburn or Curtis "was voluntarily connected to that pattern [of corrupt activity] and performed two acts in furtherance of it." *Schlosser*, 681 N.E.2d at 915.  Next, Plaintiffs also need to establish that either "performed activities necessary or helpful." *Beverly*, 2015-Ohio-219, at ¶ 19.  Finally, Plaintiffs need to show that either shared a "common

purpose" and "acted in concert" with James D., Colwell, and Miller.  *Griffin*, 24 N.E.3d at 1151.  Stated otherwise, Plaintiffs must show that James Wilburn and Curtis "conducted or participated in the conduct of the enterprise's affairs, not just their own affairs."  *State v. Sparks*, 10 N.E.3d 755, 760 (Ohio App. 2014) (quoting *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 792 (6th Cir. 2012)).  Plaintiffs cite no evidence in the record that would allow a reasonable jury to reach that conclusion.

The Court finds that the recent decision in *State v. Sparks*, 10 N.E.3d 755 (Ohio App. 2014), although it primarily involved a venue challenge, is particularly insightful to the level of association, participation, and common purpose necessary to show participation in an enterprise.  In *Sparks*, the defendant cultivated and trafficked marijuana in Butler County, but was indicted and charged with engaging in a pattern of corrupt activity in Warren County.  *Id.* at 761.  The prosecution argued that venue was proper in Warren County because a chain of marijuana dealers connected Sparks to two individuals, Lopez and Pagenstecher, who sold marijuana there.  *Id.*  The prosecution contended this was sufficient to prove Sparks participated in a pattern of corrupt activity to traffic marijuana in Warren County.  *Id.* at 759.  Because Lopez and Pagenstecher were the only individuals to act in Warren County, the dispositive issue was whether those two participated in an enterprise with Sparks.  *Id.*

The Ohio appellate court reversed and vacated the conviction because the prosecution failed to prove that the individuals "functioned as separate parts to form a whole, with a shared, common purpose."  *Sparks*, 10 N.E.3d at 762.  First, the evidence showed that each person acted in his own financial self-interest because "the fact that

each individual involved made money selling marijuana and is guilty of associating with others who buy or sell marijuana does not mean that they acted as a 'continuing unit that functions with a common purpose.'"  *Id.* at 761.  The court rejected the argument that a common purpose of making money through the sale of marijuana was sufficient to show an enterprise because there was no evidence that the individuals acted in concert:

> [E]ach individual had his own separate and distinct "business" venture when selling marijuana and that each individual participated in his own affairs.  There is no evidence that any of these individuals had any involvement in the others' business affairs; there is no evidence that they joined together to make money *for the same enterprise; and* there is no evidence demonstrating that their motive to make a profit was common in the sense it supported the enterprise.  While the various individuals may have had the same purpose in selling their marijuana (i.e., to make money), having the same purpose is not the equivalent of having a "common purpose."

*Id.*  Although "each committed crimes by selling marijuana at some given point in time," there was no evidence that the individuals had a common purpose to act together:

> [A] finding of "enterprise" would have required the state to prove that Lopez and Pagenstecher voluntarily participated in, or were in fact, associated with organized conduct for the purpose of an enterprise existing between Sparks, Baker, and the Lampes.  Neither Lopez nor Pagenstecher did anything to further Sparks' enterprise.  Rather, they sold marijuana only in furtherance of their own personal gain.

*Id.* at 762.

The court provided useful guidance to frame the current analysis:  "the more appropriate focus is upon the common purpose of the individuals involved, their combined efforts in pursuing such common purpose, and their relationship with one another."  *Sparks*, 10 N.E.3d at 763.  In reaching its conclusion, the court noted the

limited holdings in *Siferd*, a case Plaintiffs rely heavily upon, and the Supreme Court in

*Boyle*:

> *Boyle* and *Siferd* address only what is not necessary in order to find
> association with an enterprise (i.e., formalized organization, participation in
> a managerial capacity, and inter-relationship with all other enterprise
> associates). At most, these cases provide guidance here to the extent that
> the absence of formal organization, managerial control, and interaction with
> certain other individuals associated with the enterprise is not dispositive of
> whether a particular person has associated himself with that enterprise
> based upon the particular facts of those cases. *Boyle* and *Siferd* do not hold
> that the foregoing indicia are never relevant and important in determining
> whether an individual has associated himself with an enterprise.

*Id.* at 764. The court in *Sparks* also distinguished the holding in *Siferd* based on the

numerous facts showing that the defendant was voluntarily associated with and

participated in the drug trafficking enterprise:

> Siferd purchased substantial quantities of cocaine from enterprise
> associates, fronted enterprise associates money to obtain cocaine for him,
> offered enterprise associates an alternate source for cocaine when they did
> not have any on hand, and was compensated by the enterprise for his
> involvement with a reliable flow of cocaine and free cocaine. Many of
> these features of an association are lacking in the case at bar.

*Id.* at 767. This Court finds that the same features are lacking here.

Here, Plaintiffs undisputedly demonstrate the existence of an enterprise to

fraudulently induce unsophisticated investors to roll over their IRA accounts into

investments in promissory notes offered by CI or GMD and purportedly backed by a real

estate portfolio owned by GMRE. Colwell, Miller, and other salesmen recruited

investors with false representations and promises, while James D. oversaw the backend

and created false account statements to lull investors into a false sense of security. All the

while these persons embezzled the investors' money for their personal use and allowed

the few properties they actually owned to fall into disrepair and foreclosure.  As the investments slowed and the real estate bubble popped, Colwell committed suicide, while James D. and Miller landed in prison.  (Doc. 192, Ex. 1; Doc. 208, Ex. 9).

The Court is guided by the maxim that the "appropriate focus is upon the common purpose of the individuals involved, their combined efforts in pursuing such common purpose, and their relationship with one another." *Sparks*, 10 N.E.3d at 763.  Applying the undisputed evidence to these factors, the Court finds that James Wilburn and Curtis engaged in several self-centered real estate transactions wholly unrelated to that investment scheme.  Unlike in *Siferd* and *Sparks* where the sale of illegal drugs necessarily meant that the individuals all participated in the same illicit market, there is nothing inherently illegal about purchasing real estate, obtaining loans, or writing checks. James D., Miller, and Colwell used legal means to obtain illegal results through a pattern of corrupt activity.  James Wilburn and Curtis, while they may have acted questionably at specific times, did not share that common purpose of defrauding investors.

Although James Wilburn and Curtis shared a last name with one of the participants, there is no evidence that either "conducted or participated in conduct that pertained to [that] enterprise, rather than their own affairs." *Sparks*, 10 N.E.3d at 761. Curtis testified that he did not learn that James D.'s properties were in foreclosure or that James D. had defrauded others out of money until Colwell committed suicide in March 2008.  (Doc. 195 at 174, 181).  James D. defrauded his cousin Curtis out of $62,000 through a purported investment opportunity.  Curtis then went on to purchase three properties for purely personal reasons.  James Wilburn may have lent money to his cash-

strapped son, but there is no evidence he loaned that money intending to help perpetuate the Ponzi scheme or that he even knew of its existence.

A reasonable jury could not find that James Wilburn or Curtis were associated with and participated in the enterprise through a pattern of corrupt activity.  Nor could a reasonable jury find that James Wilburn or Curtis "agreed that others would commit the acts that would establish the 'pattern of corrupt activity.'"  *Feliciano*, 685 N.E.2d at 1316.

### 4. *Acquisition or Investment*

Plaintiffs also cannot show that James Wilburn or Curtis violated § 2923.32(A)(2) or (A)(3).  An acquisition claim under § 2923.32(A)(2) requires proof that James Wilburn or Curtis acquired property through a pattern of corrupt activity.  Plaintiffs show only that each acquired Midwest, but do not demonstrate that a pattern of corrupt activity allowed that acquisition.  Instead, James Wilburn acquired Midwest by exercising his creditor's rights under the Land Contract and Ohio law.  Curtis then purchased Midwest from James Wilburn through an arm's-length transaction that was duly recorded.  Plaintiffs provide no factual support for their allegations that either engaged in a pattern of corrupt activity.

Under § 2923.32(A)(3), James Wilburn and Curtis must have knowingly received proceeds from the Ponzi scheme and then used those proceeds to purchase real estate.  Plaintiffs do not address this threshold element, contending only that an investment can show proximate cause.  Plaintiffs fail to see that the OCPA requires proof of a substantive violation of § 2923.32(A)(3) before reaching the proximate cause analysis.  The Supreme Court of Ohio stressed that § 2923.32(A)(3) "refers to 'knowingly' receiving and investing proceeds from a pattern of corrupt activity, presumably to protect innocent

investors, banks, etc." *Schlosser*, 681 N.E.2d at 913 n.1.  James Wilburn and Curtis are just such innocent persons that the statute sought to exclude from criminal liability. Plaintiffs cannot circumvent this intent in seeking to impose civil liability.

### 5. *Proximate Cause*

Finally, even if James Wilburn and Curtis did violate a substantive provision of the OCPA, Plaintiffs cannot show this violation proximately caused their injuries.  The undisputed evidence shows that Plaintiffs lost their investment because James D. and Colwell solicited unsophisticated investors with false promises of guaranteed returns and a portfolio of real estate they did not own, and then James D. and Colwell used the investments for personal purposes or to pay earlier investors.  (Doc. 208, Ex. 9).  In the end, over 90 victims lost upward of $9.2 million.

In *TJX Cos. v. Hall*, 916 N.E.2d 862 (Ohio App. 2009), one of the defendants in an OCPA civil action was criminally convicted of engaging in a pattern of corrupt activity, receiving stolen property in excess of $100,000, and money laundering.  *Id.* at 867.  The defendant and her mother, who played a more active role in the case, participated in a retail scheme that resulted in almost $2 million in stolen cash and merchandise.  *Id.* at 867, 870.  The criminal court found that the defendant "knew that the money she received and controlled was the fruit of an illegal activity and that she expressed the knowledge of the source of the money, which was the retail theft."  *Id.* at 868.  In the civil action, these finding were sufficient to conclusively establish that the defendant was an active participant in the enterprise that caused the injury to the store and also proximately caused that injury.  *Id.*

While not dispositive, it is notable that James Wilburn and Curtis were never investigated as part of any of the multiple state and federal criminal investigations into CI and GMD.  Even if James Wilburn and Curtis actually did everything of which they are accused, Plaintiffs cannot show that this conduct proximately caused the loss of their investments.  Curtis acquired several pieces of real estate that undisputedly were not connected to the Real Estate Portfolio.  If Curtis used fraudulent mortgage loans to finance those purchases, that injury would fall on the banks.  However, Plaintiffs produce no evidence that Curtis missed even a single mortgage payment.

In *State v. Stevens*, 11 N.E.3d 252 (Ohio 2014), the Supreme Court of Ohio derided the recent expansion of the OCPA to reach those to those clearly not intended to fall within its reach:

> Should an 18-year-old high school senior who sells $10 worth of marijuana to classmates be prosecuted as a first-degree felon under the Ohio RICO Act merely because the drugs could be traced back to a multibillion-dollar Colombian drug cartel?  How would this put a damper on organized crime in Ohio?  That student is acting as an individual, and his conviction and punishment would have no discernable effect on the fight against organized crime.

*Id.* at 256.  The same logic applies here.  James D., Colwell, and Miller perpetrated a Ponzi scheme that defrauded 90 victims out of $9.2 million.  At best, Plaintiffs accuse James Wilburn of giving James D. around $150,000, cancelling a land contract for the sale of a trailer park several months after James D. defaulted, and then selling that trailer park to his nephew.  Curtis is accused of submitting false loan applications, purchasing a trailer park from his uncle, and giving James D. $22,000.  The evidence shows that James Wilburn and Curtis acted as individuals, not as part of a Ponzi scheme.  Imposing civil

liability with the attendant treble damages would necessitate stretching the OCPA beyond its limits.

There is no evidence that James Wilburn or Curtis violated a substantive provision of the OCPA or conspired with others to do the same. Further, there is no evidence that Plaintiffs' lost investments were proximately caused by any act or omission of James Wilburn or Curtis. Accordingly, James Wilburn and Curtis are entitled to judgment as a matter of law on Plaintiffs' OCPA and OCPA conspiracy claims.[29]

## VI.    FEDERAL RICO

Plaintiffs also move for summary judgment against James D. and Miller on one of their RICO claims. The federal RICO statute is substantially similar to the OCPA. *See Beverly*, 2015-Ohio-219, at ¶ 3. RICO provides a private cause of action "[a]ny person injured in his business or property by reason of a violation of" one of the statute's four criminal provisions. 18 U.S.C. § 1964(c). Plaintiffs' amended complaint alleged violations of all four provisions, but their motion for summary judgment only recounts the elements for a violation of 18 U.S.C. § 1962(c). (Doc. 208 at 23).

Plaintiffs must prove the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013). The OCPA equivalent is Ohio Rev. Code § 2923.32(A)(1), which Plaintiffs have established James D. violated. Accordingly, Plaintiffs have established that James D. committed a substantive 18 U.S.C. § 1962(c).

---

[29] James Wilburn's motion to sever; motion to bifurcate; and motion to exclude evidence (Doc. 207) is therefore **DENIED** as moot.

Although RICO generally excludes "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962," that exception "does not apply to an action against any person that is criminally convicted in connection with the fraud."  18 U.S.C. § 1964(c).  James D. agreed in his statement of facts that promissory notes issued by CI and GMD constituted "securities" within the meaning of federal and state securities law.  (Doc. 208, Ex. 9 at 2).  This is sufficient to remove the limitation on civil actions in 18 U.S.C. § 1964(c).  James D. proximately caused Plaintiffs' injury under the RICO analysis and the OCPA analysis.  Accordingly, Plaintiffs are entitled to judgment as a matter of law on their 18 U.S.C. § 1962(c) RICO claim against James D.

Plaintiffs have failed to show that Miller violated 18 U.S.C. § 1962(c).[30]  Plaintiffs present no evidence nor even any argument on this claim with respect to Miller.[31]  Accordingly, Plaintiffs have failed to show that they are entitled to judgment as a matter of law against Miller.

---

[30] The Court reiterates its conclusion that Plaintiffs did not move for summary judgment on count five, which asserted a RICO conspiracy under 18 U.S.C. § 1962(d).  Plaintiffs conspicuously did move for summary judgment on their OCPA conspiracy claim.  (Doc. 208 at 26-27).

[31] The only two sentences that pertain to the RICO claim against Miller provide:  "Miller has been convicted of federal securities crimes 'in connection with securities fraud.'  For that reason, Bradleys have established their federal RICO claim against Miller."  (Doc. 208 at 50-51).  Beyond the inaccuracy that Miller was not convicted of a federal securities crime, that alone would not be sufficient to satisfy the remaining elements.

## VII.   CONCLUSION

Wherefore, for these reasons, the Court finds as follows:

+  The motions for summary judgment filed by Defendants James Wilburn Powell and Curtis Powell (Docs. 198, 205) are **GRANTED**; and Plaintiffs' cross motion for summary against Defendants James Wilburn Powell and Curtis Powell (Doc. 208) is **DENIED**.  As no claims remain pending against Defendants James Wilburn Powell and Curtis Powell, Defendants James Wilburn Powell and Curtis Powell are hereby **DISMISSED** from this action.

+  Plaintiffs' motion for summary judgment (Doc. 208) is **GRANTED** as to their claims for violations of OCPA, OCPA conspiracy, and RICO (18 U.S.C. § 1962(c) only) against Defendant James D. Powell.[32]

+  Plaintiffs' motion for summary judgment (Doc. 208) is **GRANTED** as to their OCPA conspiracy claim against Defendant Kevin Miller.

+  Plaintiffs' motion for summary judgment (Doc. 208) is **DENIED** as to the OCPA and RICO claims against Defendant Miller.[33]

---

[32] The Bradleys originally asserted eleven claims against Defendants James D. Powell and Kevin Miller.  (Doc. 46).

The following six claims remain pending against Defendant James D. Powell: (a) count two, 18 U.S.C. § 1962(a); (b) count three, 18 U.S.C. § 1962(b); (c) count five, 18 U.S.C. § 1962(d); (d) count eight, fraud; (e) count nine, breach of contract; and (f) count ten, negligence.  The Court *sua sponte* dismisses count eleven, fraudulent transfer, and count twelve, civil conspiracy, as these claims are barred by the statute of limitations.  *See supra* pp. 23-29.

[33] The following eight claims remain pending against Defendant Kevin Miller:  (a) count two, 18 U.S.C. § 1962(a); (b) count three, 18 U.S.C. § 1962(b); (c) count four, 18 U.S.C. § 1962(c); (d) count five, 18 U.S.C. § 1962(d); (e) count six, Ohio Rev. Code § 2923.32; (f) count eight, fraud; (g) count nine, breach of contract; and (h) count ten, negligence.  The Court *sua sponte* dismisses

Within fourteen days of the entry date of this Order, Plaintiffs shall advise the Court in writing whether they intend to pursue their remaining claims.[34]

The determination of James D. Powell's and Kevin Miller's damages also remains pending before the Court.[35]  Plaintiffs shall evidence their damages and attorney's fees as against James D. Powell and Kevin Miller by filing a verified pleading within twenty-one days of the entry date of this Order, and James D. Powell and Kevin Miller shall respond in opposition within fourteen days of that filing.  Plaintiffs may reply within ten days.

**IT IS SO ORDERED**.

Date:  3/30/2015                                       ___*s/ Timothy S. Black*_____
                                                      Timothy S. Black
                                                      United States District Judge

---

count eleven, fraudulent transfer, and count twelve, civil conspiracy, as these claims are barred by the statute of limitations.  *See supra* pp. 23-29.

Finally, Plaintiff Cora Pyles' securities law claim in count one remains pending against Defendant Kevin Miller.

[34]  *See supra* notes 32-33.

[35]  The Court notes that default judgment as to liability and damages was previously entered against Defendants CI, GMD, and GMRE.  (Doc. 188).  The Court found that Plaintiffs Diana and James Bradley evidenced $134,354.46 in damages, which were trebled pursuant to Ohio Rev. Code § 2923.34(F).  (*Id.*)  Accordingly, the Court found Defendants CI, GMD, and GMRE jointly and severally liable for $403,063.40 in damages.  (*Id.*)  Presumably, Plaintiffs will also seek to hold Defendants James D. Powell and Kevin Miller jointly and severally liable for this amount.